# EXHIBIT A

1
2
3
4
5
6
7                          UNITED STATES DISTRICT COURT
8                          CENTRAL DISTRICT OF CALIFORNIA
9
10   CARE FIRST SURGICAL CENTER, a        )   CASE NO. CV 14-01480 MMM (AGRx)
     California limited liability company, )
11                                          )   ORDER GRANTING DEFENDANTS'
12                Plaintiff,               )   MOTION TO DISMISS
                                            )
13           vs.                           )
                                            )
14   ILWU-PMA WELFARE PLAN, in its         )
     capacity as Plan Administrator of the )
15   ILWU-PMA Coastwise Indemnity; ILWU    )
     COASTWISE INDEMNITY PLAN,             )
16                                          )
                  Defendants.              )
17   _____)
18
19        On February 27, 2014, Care First Surgical Center ("Care First") filed this action against
20   the Trustees of the ILWU-PMA Welfare Plan, in their capacity as plan administrator of the
21   ILWU-PMA Coastwise Indemnity Plan ("the plan administrator"), and ILWU-PMA Coastwise
22   Indemnity Plan ("the plan").[1]   The complaint alleges four claims under the Employee Retirement
23   Income Security Act of 1974 ("ERISA") for disclosure and statutory penalties under 29 U.S.C.
24   §§ 1132(a)(1)(A) and 1132(c), disclosure and statutory penalties under 29 C.F.R. § 2560.503-1,
25   benefits under 29 U.S.C. § 1132(a)(1)(B), and breach of fiduciary duty under 29 U.S.C.
26   § 1132(a)(3).   In addition, Care First asserts state law claims for breach of implied contract,
27   _____
28        [1]Complaint, Docket No. 1 (Feb. 27, 2014).

EXHIBIT A
PAGE 5

Case 2:14-cv-02189-MWF-AGR  Document 32  Filed 07/28/14  Page 2 of 48  Page ID #:603

1  breach of oral contract, and negligent misrepresentation.[2]  On March 28, 2014, defendants filed

2  a motion to dismiss.[3]  Care First opposes the motion.[4]

3

4  ## I.  FACTUAL BACKGROUND

5  Care First is a surgical center located in Los Angeles, California, which serves individuals

6  who are covered participants and beneficiaries under the plan, including the two plan participants

7  at issue in this case, CC and DC.[5]  Care First contends that prior to providing medical care to CC

8  and DC, it participated in recorded telephone conversations with representatives of Zenith

9  Administrators ("Zenith"), the claims administrator for the plan, which is purportedly a self-

10  funded employee welfare benefit plan under ERISA.[6]  In these conversations, Care First allegedly

11  verified with Zenith representatives that CC and DC were covered beneficiaries under the plan.[7]

12  _____

13  [2]*Id.*

14  [3]Motion to Dismiss ("Motion"), Docket No. 8 (Mar. 28, 2014).

15  [4]Opposition to Motion to Dismiss ("Opposition"), Docket No. 20 (June 2, 2014).

16  [5]Complaint, ¶¶ 1, 10.  ERISA defines "participant" as "any employee or former employee
17  of an employer, or any member or former member of an employee organization, who is or may
    become eligible to receive a benefit of any type from an employee benefit plan which covers
18  employees of such employer or members of such organization, or whose beneficiaries may be
    eligible to receive any such benefit."  29 U.S.C. § 1002(7).  It defines "beneficiary" as "a person
19  designated by a participant, or the terms of an employee benefit plan, who is or may become
20  entitled to a benefit thereunder."  *Id.*, § 1002(8).

21  [6]Complaint, ¶¶ 11-12.  Section 1002 defines "'employee welfare benefit plan' . . . [as] any
22  plan, fund, or program which was heretofore or is hereafter established or maintained by an
    employer or by an employee organization, or by both, to the extent that such plan, fund, or
23  program was established or is maintained for the purpose of providing for its participants or their
24  beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital
    care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment,
25  or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship
    funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other
26  than pensions on retirement or death, and insurance to provide such pensions)."  29 U.S.C.
27  § 1002(1).

28  [7]Complaint, ¶ 12

2

It also allegedly asked whether the contemplated surgical procedures required to treat CC and DC were covered by the plan; Zenith representatives confirmed that they were, and that CC and DC were therefore eligible to receive medical benefits for such procedures.[8]  Care First contends that it also asked whether the plan contained an anti-assignment provision and was told it did not.[9]  Care First asked whether claims would be paid at the usual and customary rate in Care First's geographic location and in accordance with the Multiplan contract, and was advised by the representatives that there were no restrictions on CC's and DC's benefits, that the Multiplan contract applied, and that the plan covered 80% of the usual and customary rate for procedures in Care First's geographic location.[10]  Care First asserts that it has provided medical care to other plan participants in the past, and that defendants processed benefits for these individuals in accordance with the representations made by Zenith representatives in recorded telephone calls.[11]

Care First alleges that prior to receiving medical care at its facility, CC and DC both assigned their "benefits and ERISA representative rights under the plan" to Care First.[12]  In reliance on the Zenith representatives' statements regarding coverage, Care First provided medical services to CC and DC on April 9, August 20, and September 24, 2013, at a cost of more than $85,000.[13]  Thereafter, Care First submitted HCFA 1450 claim forms, which included itemized

---

[8]*Id.*, ¶¶ 12, 43.

[9]*Id.*, ¶ 12

[10]*Id.*, ¶ 12, 55.  Although not explicitly alleged in the complaint, it appears the term Multiplan contract refers to the plan agreements.

[11]*Id.*, ¶ 12.

[12]*Id.*, ¶ 13.

[13]*Id.*, ¶¶ 14, 47.

3

lists of fees and expenses, to the plan for reimbursement.[14]  The plan, however, made adverse benefit determinations regarding the claims.[15]

Care First alleges that on December 14 and 23, 2013, and January 1, 2014, it made written demand that defendants produce contracts and documents concerning the establishment and operation of the plan, and all information, records, and documents concerning the processing of Care First's claims.[16]  Care First also appealed the adverse benefit determinations.[17]  Care First sent a copy of its appeals to the plan, but did not receive any response.[18]  It alleges that on December 18, 2013, Zenith gave it information indicating that a "re-pricing" entity had reviewed one of the two claims for procedures performed for CC and determined that a payment of $13,549.75 should be allowed.[19]  The plan, however, has purportedly refused, and continues to refuse, to produce any documents, records, or other information concerning Care First's claims.[20]  Care First asserts, for example, that the plan has failed to produce documents explaining how its claims were processed, including documents that contain the names and credentials of the individuals who processed the claims, the reasons for, or methodology behind, the repricing of the claims, and the fee schedule or database that was used to manipulate the reimbursement rate to something different from that discussed during the recorded telephone calls.[21]

Care First asserts that it should be deemed to have exhausted administrative remedies given defendants' defective notice and failure to provide an appropriate appeal process pursuant to 29

---

[14]*Id.*, ¶ 15.

[15]*Id.*, ¶¶ 16, 55.

[16]*Id.*, ¶ 17.

[17]*Id.*, ¶ 18.

[18]*Id.*

[19]*Id.*, ¶¶ 18, 48.

[20]*Id.*, ¶ 19.

[21]*Id.*, ¶ 22.

4

C.F.R. § 2560.503-1(*l*).[22]  It alleges that the plan had a duty to provide documents responsive to

its written requests and to pay its claims for reimbursement in full, and that it breached these

duties.[23]  Care First also contends that the plan owes it the difference between the cost of the

services it provided, $85,000, and the amount of reimbursement it received, $13,549.75.  It

asserts ERISA claims derivatively, as the alleged assignee of CC's and DC's rights under the act.[24]

## II.  DISCUSSION

**A.  Care First's Request for Judicial Notice and the Parties' Submission of Evidence Outside the Pleadings**

### 1.  Care First's Request for Judicial Notice

Care First requests that the court take judicial notice of five opinions it contends are

relevant to the court's decision of this motion: *Care First Surgical Center v. Toll Global Forwarding, USA, et al.*, Case No. CV 13-02430 GW (MANx) (C.D. Cal. Aug. 12, 2013), *Eden Surgical Center v. Centric Group, et al.*, Case No. CV 10-07024 RGK (MANx) (C.D. Cal. Feb. 8, 2012), *Eden Surgical Center v. B. Braun Medical, Inc.*, Case No. CV 09-01011 SVW (AJWx) (C.D. Cal. Sept. 9, 2009), *Eden Surgical Center v. B. Braun Medical, Inc.*, 420 Fed. Appx. 696 (9th Cir. 2011) (Unpub. Disp.), and *Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869 (7th Cir. 2013).[25]

---

[22]Section 2560.503-1(*l*) provides that "[i]n the case of the failure of a plan to establish or follow clams procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim."  29 C.F.R. § 2560.503-1(l).

[23]Complaint, ¶¶ 24-25, 30-31, 48.

[24]*Id.*, ¶ 7.

[25]Care First's Request for Judicial Notice ("RJN"), Docket No. 20-3 (June 2, 2014).

EXHIBIT A
PAGE 9

1  In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the

2  complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d

3  977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542,

4  1555 n. 19 (9th Cir. 1990). A court must normally convert a Rule 12(b)(6) motion into a Rule

5  56 motion for summary judgment if it "considers evidence outside the pleadings. . . . A court

6  may, however, consider certain materials – documents attached to the complaint, documents

7  incorporated by reference in the complaint, or matters of judicial notice – without converting the

8  motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903,

9  907-08 (9th Cir. 2003). See *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322

10 (2007) (a court may consider "other sources courts ordinarily examine when ruling on Rule

11 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference,

12 and matters of which a court may take judicial notice"); *Branch v. Tunnell* 14 F.3d 449, 453 (9th

13 Cir. 1994) (noting that a court may consider a document whose contents are alleged in a

14 complaint, so long as no party disputes its authenticity), overruled on other grounds by *Galbraith*

15 *v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

16  Thus, in ruling on a motion to dismiss, the court can consider material that is subject to

17 judicial notice under Rule 201 of the Federal Rules of Evidence. FED.R.EVID. 201. Under Rule

18 201, the court can judicially notice "[o]fficial acts of the legislative, executive, and judicial

19 departments of the United States," and "[f]acts and propositions that are not reasonably subject

20 to dispute and are capable of immediate and accurate determination by resort to sources of

21 reasonably indisputable accuracy." FED.R.EVID. 201.

22  The court may take judicial notice of unpublished court decisions, although notice is limited

23 to the existence of the documents and not to the truth of the matters asserted therein. See *Reyn's*

24 *Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) ("We may take

25 judicial notice of court filings and other matters of public record"); *Lucero v. Wong*, No. C

26 10–1339 SI (pr), 2011 WL 5834963, *5 (N.D. Cal. Nov. 21, 2011) ("To the extent petitioner

27 wants the existence of published or unpublished cases judicially noticed as adjudicative facts,

28 doing so is of very limited value because the court can take notice that such decisions exist, but

1  the court does not take judicial notice that those decisions are correct"); *Player v. Salas*, No.

2  04cv1761-LAB (WMc), 2007 WL 935100, *10 (S.D. Cal. Mar. 22, 2007) ("Defendants' request

3  that the Court take judicial notice of Defendants' Exhibit A, the unpublished opinion entitled In

4  re MARCUS PLAYER on Habeas Corpus, is hereby GRANTED, although not for the truth of its

5  contents"); *Toth v. Automobile Club of Cal. Long Term Disability Plan*, No. CV014653MMM

6  (RCx), 2005 WL 1877150, *23 (C.D. Cal. Jan. 27, 2005) (taking judicial notice of unpublished

7  district court opinions).  Thus, the court grants Care First's request that it judicially notice the slip

8  opinions from other courts in this district as well as *Eden Surgical Center v. B. Braun Medical,*

9  *Inc.*, 420 Fed. Appx. 696 (9th Cir. 2011) (Unpub. Disp.).  As defendants argue,[26] however,

10  notice extends only to the fact of their existence and not to the ruth of the facts argued or found

11  therein.

12  It is unnecessary to take judicial notice of the Seventh Circuit's opinion in *Kenseth v. Dean*

13  *Health Plan, Inc.*, 722 F.3d 869 (7th Cir. 2013), however, as *Kenseth* is a published decision.

14  See, e.g., *Lucero v. Wong*, No. C 10–1339 SI (pr), 2011 WL 5834963, *5 (N.D. Cal. Nov. 21,

15  2011) ("It is unnecessary to request that the court judicially notice published cases from California

16  and federal courts as legal precedent; the court routinely considers such legal authorities in doing

17  its legal analysis without a party requesting that they be judicially noticed"); *Jacquett v. Sisto*, No.

18  CIV S-06-2938 RRB EFB P, 2008 WL 1339362, *1 (E.D. Cal. Apr. 9, 2008) (construing a

19  request that the court take judicial notice of a published Ninth Circuit decision as "a notice of

20  supplemental authority"); *Chapman v. Chast Manhattan Mortg. Corp.*, No.

21  04-CV-0859-CVE-FHM, 2007 WL 4268774, *2 n. 7 (N.D. Okla. Nov. 30, 2007) ("Plaintiff's

22  motion could also be construed as request to take judicial notice of legal precedent. . . .  As a

23  matter of course, federal courts are bound to apply precedent without formally taking judicial

24  notice of law, and the procedure for judicial notice under Fed.R.Evid. 201 applies only to

25  adjudicative facts"); see also *Getty Petroleum Marketing, Inc. v. Capital Terminal Co.*, 391 F.3d

26

27

28  [26]Defendants' Objections to Plaintiff's Request for Judicial Notice Submitted in Opposition to Defendants' Motion to Dismiss, Docket No. 22 (June 9, 2014), at 2.

7

312, 322 (1st Cir. 2004) (Lipez, J., concurring) ("Judicial notice of law is the name given to the commonsense doctrine that the rules of evidence governing admissibility and proof of documents generally do not make sense to apply to statutes or judicial opinions – which are technically documents – because they are presented to the court as law, not to the jury as evidence. . . . Although judicial notice of fact and judicial notice of law share the phrase 'judicial notice,' they draw on different rules of practice.  Rule 201 'governs only judicial notice of adjudicative facts.' . . . Judicial notice of law is outside the scope of Rule 201, and derives from practical considerations and case law that do not rely on Rule 201 or principles of evidence").  Moreover, the court finds the reasoning in *Kenseth* irrelevant to decision of the motion for reasons stated *infra*, and denies Care First's request on both of these bases.

### 2. Defendants' Request that the Court Consider the Terms of the Plan Agreements

Defendants seek to have the court consider the terms of the plan agreements under the incorporation by reference doctrine.[27]  The incorporation by reference doctrine "permits a district court to consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleadings.'" *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 986 (9th Cir. 1999) (citing *Branch*, 14 F.3d at 454).  The court may consider the plan documents under the incorporation by reference doctrine because Care First's ERISA claims and the basis upon which it asserts it has standing to sue rely on the terms of the plan.  Neither party, moreover, questions the authenticity of the documents. See, e.g., *Koblentz v. UPS Flexible Employee Benefit Plan*, No. 12–CV–0107–LAB, 2013 WL 4525432, *1-2 (S.D. Cal. Aug. 23, 2013) (considering ERISA plan documents under the incorporation by reference doctrine in a case alleging failure to cover medical treatment); *Spinedex Physical Therapy USA, Inc. v. United Healthcare of Arizona, Inc.*, 661 F.Supp.2d 1076, 1086 (D. Ariz. 2009) ("Because the Complaint depends upon the construction of these documents to establish Spinedex's standing, they may be considered. . . .  The policy documents are

---

[27]Motion at 4.

8

EXHIBIT A
PAGE 12

authenticated with an affidavit from Defense counsel and Plaintiffs have not properly objected to their authenticity").

Care First contends the court should not consider the plan agreements because they were not disclosed to it during the administrative process and they are therefore not properly part of the administrative record.[28]  Defendants counter that Care First lacks standing under the plan agreements, and thus had no right to appeal the claims denials.  Consequently, they assert, there is no administrative record relevant to its claims.[29]  Both arguments miss the mark.

First, while Care First argues that defendants never raised the anti-assignment provisions during the administrative process, it does not allege this fact in the complaint.[30]  Arguments made in briefs are not facts alleged in the complaint, and the court cannot consider them in deciding a motion to dismiss.  See *Garza v. Endo Pharmaceuticals*, No. CV 12–1585–CAS (OPx), 2012 WL 5267897, *2 (C.D. Cal. Oct. 24, 2012) ("Plaintiffs present a number of potential theories by which CVS may have acted negligently in their opposition but arguments in an opposition are not factual allegations that this Court may consider"); *Stine v. Trotter*, No. EDCV 08-00251-RGK (MLG), 2008 WL 4068904, *4 (C.D. Cal. Aug. 13, 2008) ("[T]he Court will not consider factual allegations made in a plaintiff's opposition").

Second, the fact that defendants may not have disclosed the terms of the plan agreements to Care First does not necessarily mean that the court cannot consider them because they are outside the administrative record.  Whether a court can consider evidence outside the

---

[28]Care First's Objections to Evidence Submitted in Support of Defendants' Motion to Dismiss ("Objections"), Docket No. 20-4 (June 2, 2014), at 2-3.

[29]Reply in Support of Motion to Dismiss ("Reply"), Docket No. 24 (June 9, 2014), at 6 n. 4.

[30]Laurence Reich, Care First's authorized representative, states that the only documents defendants have ever produced regarding the underlying claims for reimbursement and request for disclosure of documents are the plan agreements.  He contends, however, that defendants did not disclose the contracts until they filed their motion to dismiss on March 28, 2014.  (See Declaration of Laurence Reich in Opposition to Defendants' Motion to Dismiss ("Reich Decl."), Docket No. 20-1 (June 2, 2014), ¶ 9.)  As the court declines to convert this motion into a motion for summary judgment *infra*, it is inappropriate to rely on evidence at this juncture.

9

administrative record "depends on whether review is de novo (because the plan failed to confer discretion on the administrator) or for abuse of discretion (because the plan unambiguously conferred discretion). . . . [C]ourts limit a district court to the administrative record when the court is reviewing a case on the merits for an abuse of discretion; consideration of new evidence is permitted only in conjunction with de novo review of a denial of benefits." *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955, 969 (9th Cir. 2006); see also *Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1110 (9th Cir. 2003) ("While under an abuse of discretion standard our review is limited to the record before the plan administrator, this limitation does not apply to *de novo* review"). Care First does not argue that the court should review the denial of its claims for abuse of discretion.  It has therefore not established that consideration of evidence outside the record would be improper.

Finally, and most importantly, the plan agreements are not outside the administrative record for the purposes for which the court considers them in this order.[31]  The court considers

---

[31]The court doubts, moreover, whether the plan agreements could ever be deemed to be outside the administrative record and beyond the scope of review.  The administrative record is "the record before the plan administrator," *Jebian*, 349 F.3d at 1110, not the record the plan provided to the participant, beneficiary, or assignee following its determination.  Whether or not defendants waived their right to rely on the anti-assignment provisions as a substantive basis for denying of Care First's claim, and whether or not they failed to disclose the plan agreements to Care First in response to Care First's request for disclosure of documents may make specific provisions of the agreements irrelevant in reviewing the validity of the claim denial.  It is almost certain, however, that the plan agreements were before the plan administrator when it denied Care First's claims.  For that reason, it does not appear the plan agreements could be considered outside the administrative record.  See *Brooking v. Hartford Life and Accident Insurance Co.*, 167 Fed. Appx. 544, 547 n. 4 (6th Cir. Feb. 16, 2006) (Unpub. Disp.) ("[T]he rule preventing a reviewing court from considering evidence outside the administrative record does not preclude consideration of the plan documents"); *Bass v. TRW Employee Welfare Benefits Trust*, 86 Fed. Appx. 848, 851 (6th Cir. Jan. 21, 2004) (Unpub. Disp.) ("Bass is unquestionably correct in his assertion that a district court when reviewing a plan administrator's denial of benefits cannot look past the administrative record. . . .  The case law makes clear, however, that the rule was intended to prevent the courts from looking past the *evidence of disability* – medical reports, correspondence, test results, and the like – considered by the plan administrator; it does not suggest that the rule covers the benefits plan itself"); *Ward v. Cigna Life Insurance Co. of New York*, 776 F.Supp.2d 155, 160 (W.D.N.C. 2011) (citing *Bass*, noting that a court may consider the benefit plan itself even though not included in the administrative record, and stating: "Indeed, the Plaintiff refers

EXHIBIT A
PAGE 14

1  the anti-assignment provisions of the agreements in this order not because they were used as a

2  substantive basis for denying Care First's claims but because Care First's standing to bring this

3  lawsuit depends on them.  The court therefore need not decide for purposes of this order whether,

4  as a matter of evidence, the plan agreements are properly considered part of the administrative

5  record on which the denial of Care First's claims must be reviewed.  For purposes of defendants'

6  motion to dismiss, the court can consider the substance of the agreements under the incorporation

7  by reference doctrine because Care First's standing depends on the terms of those agreements.

8  Cf. *Parisi v. Kaiser Foundation Health Plan Long Term Disability Plan*, No. C 06-04359 JSW,

9  2008 WL 220101, *3 (N.D. Cal. Jan. 25, 2008) ("Plaintiff contends that the Release was not part

10 of the administrative record and was not the reason that he was denied long term benefits.

11 Therefore, Plaintiff contends that the Court would err by exercising its discretion to review

12 material outside of the administrative record to review the denial for abuse of the administrator's

13 discretion. . . . The Court does not find that the review of the Release is similar to the admission

14 of post-denial medical evidence.  Here, the Court is not opening up the administrative record or

15 reviewing the administrator's denial under an abuse of discretion standard.  Rather, the Court

16 reviews the Release as part of Defendant's affirmative defense of waiver and, because the

17 agreement is central to the relationship between the parties, the Court finds it material"); see also

18 *Orndorf v. Paul Revere Life Insurance Co.*, 404 F.3d 510, 520 (1st Cir. 2005) ("There may be

19 times when it is appropriate for courts to hear new evidence.  Where the challenge is not to the

20 merits of the decision to deny benefits, [for example,] . . . outside evidence may be of

21 relevance").

22

23

———————————

24 to the Group Policy in his complaint although he did not attach a copy thereof.  When a Plan
   document is referenced in the complaint but no copy is attached, the defendant may submit an
25 authentic copy"); *McTaggart v. United Wisconsin Insurance Co.*, 625 F.Supp.2d 480, 483 (E.D.
   Mich. 2007) ("[T]he court also rejects Plaintiff's argument that the Court is precluded from
26 examining the plan itself simply because it was not included in the Administrative Record");
   *Harbison v. Hartford Life and Accident Insurance Co.*, No. 1:03cv856, 2007 WL 1665300, *19
27 (S.D. Ohio June 5, 2007) ("Th[e] rule [precluding review of documents outside the administrative
28 record] . . . does not preclude review of the benefits plan itself").

EXHIBIT A
PAGE 15

### 3. Care First's Submission of Summary Judgment-Type Evidence

In support of its opposition, Care First has submitted seven exhibits attached to the declarations of its counsel and a Care First representative: the assignments at issue in a different case litigated in this district, *Eden Surgical Center v. B. Braun Medical, Inc.*, Case No. CV 09-01011 SVW (AJWx), the transcripts of the recorded calls Care First allegedly had with Zenith, and emails Care First states it sent to defendants regarding the adverse benefit determinations at issue, each of which includes as attachments a copy of the appeal Care First submitted to Zenith and the assignments Care First received from CC and DC.[32]  Care First has identified no basis on which the court can consider these documents in deciding a motion to dismiss.  None of the documents was attached to Care First's complaint.  None is a proper subject of judicial notice, as they are not capable of ready and accurate determination by resort to sources of indisputable accuracy.  The assignments from *Eden*, transcripts of telephone calls, emails to defendants, and appeals to Zenith likewise cannot be considered under the incorporation by reference doctrine, as the complaint does not allege the contents of the documents and Care First's standing is not dependent on them.  The complaint does allege the contents of the assignments, however.  As discussed *infra*, the scope of the assignments and therefore Care First's derivative standing depends on the specific language used therein.  Neither party disputes the authenticity of the

---

[32]See Declaration of Laurence Reich in Opposition to Defendants' Motion to Dismiss ("Reich Decl."), Docket No. 20-1 (June 2, 2014), Exhs. 1 (Transcript of April 20, 2012 Call), 2 (Transcript of January 24, 2013 Call), 3 (Transcript of July 23, 2013 Call), 4 (November 12, 2013 Email from Reich to Defendants ("November Email")), 5 (December 26, 2013 Email from Reich to Defendants ("December Email")), and 6 (January 1, 2014 Email from Reich to Defendants ("January Email")); Declaration of Bradley E. Jewett in Opposition to Defendants' Motion to Dismiss ("Jewett Decl."), Docket No. 20-2 (June 2, 2014), Exh. 7.

EXHIBIT A
PAGE 16

assignments Reich has attached to his declaration.[33]  Accordingly, the court will consider the contents of the assignments under the incorporation by reference doctrine.

The court will not consider the remaining documents, however, because it cannot do so without converting the motion into a motion for summary judgment, which it declines to do.[34]  See *Century Sur. Co. v. Master Design Drywall, Inc.*, No. 09CV0280–LAB (AJB), 2009 WL 3425326, *1 (S.D. Cal. Oct. 21, 2009) ("It is up to the Court to decide whether it will consider or reject [ ] material [outside the pleadings]"); *E.E.O.C. v. Creative Networks, LLC*, Case No. CV 05-3032, 2006 WL 3834286, *3 (D. Ariz. Dec. 29, 2006) (refusing to convert a motion to dismiss into a motion for summary judgment based on documents extraneous to the complaint because discovery and Rule 26(a) disclosures had not occurred); *Trew v. Volvo Cars of North America, LLC*, Case No. CIV-S-051379, 2006 WL 306904, *5 (E.D. Cal. Feb. 8, 2006) (declining to consider declarations attached to a motion to dismiss and to convert the motion into

---

[33]At the hearing, defense counsel objected to this statement.  He argued that defendants had "contest[ed] the entirety of [Reich's] declaration," including the authenticity of the assignments.  The court has reviewed the evidentiary objections defendants submitted in support of their reply.  (See Defendants' Objections to Plaintiff's Evidence Submitted in Opposition to Defendants' Motion to Dismiss ("Objections"), Docket No. 23 (June 9, 2014).)  In that document, defendants observed generally that unless the court converted a motion to dismiss into a motion for summary judgment, it could not consider documents that were not attached to the pleading except under the incorporation by reference doctrine, which requires that a document's authenticity be undisputed.  (*Id*. at 1-2.)  The objections then address the transcripts of telephone calls between Care First and Zenith, and argue that the court cannot consider them in deciding the motion to dismiss due, *inter alia*, to "*Knievel/Parrino* Authenticity."  The pleading contains a paragraph that discusses the basis for defendants' objection to the transcripts on authenticity grounds.  (*Id*. at 3-6.)  With respect to the emails and the attachments containing the purported assignments, however, defendants offered only the following objections: "Inadmissible legal opinion"; "Lacks foundation"; "Improper Evidence; Irrelevant"; "Prejudicial; Likely to Result in Confusion, Delay, Waste of Time or Cumulative Evidence."  (*Id*. at 6-9.)  Defendants did *not* object to the authenticity of the assignments.  The court therefore finds it appropriate to consider the assignments under the incorporation by reference doctrine in deciding this motion.  Defendants can contest the authenticity of the assignments in subsequent proceedings if appropriate.

[34]Because the court declines to convert the motion into a motion for summary judgment, it need not consider the multitude of evidentiary objections defendants asserted to the evidence submitted by Care First. (See Defendants' Objections to Plaintiff's Evidence Submitted in Opposition to Defendants' Motion to Dismiss, Docket No. 23 (June 9, 2014).)

13

1    a motion for summary judgment because plaintiff had not had sufficient time to conduct

2    discovery); *Meridian Project Systems, Inc. v. Hardin Const. Co., LLC*, Case No. CIV– 04–2728,

3    2005 WL 2615523, *1 n. 1 (E.D. Cal. Oct. 14, 2005) (declining to convert a motion to dismiss

4    into a motion for summary judgment because discovery had just commenced).

5    ### B.   Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6)

6    A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint.

7    A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal

8    theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri*

9    *v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). The court must accept all factual

10   allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences

11   from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38

12   (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).

13   The court need not, however, accept as true unreasonable inferences or conclusory legal

14   allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 540 U.S.

15   544, 553–56 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

16   need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his

17   'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of

18   the elements of a cause of action will not do"). Thus, a plaintiff's complaint must "contain

19   sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'

20   . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court

21   to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*

22   *v. Iqbal*, 556 U.S. 662, 678 (2009); see also *Twombly*, 550 U.S. at 545 ("Factual allegations must

23   be enough to raise a right to relief above the speculative level, on the assumption that all the

24   allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United*

25   *States Secret Service*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion

26   to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must

27   be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly*).

28

14

## C.     Whether Care First Has Standing to Pursue its ERISA Claims

Defendants first argue that Care First lacks standing to bring its ERISA claims.  They contend that Care First has inadequately alleged that it is the assignee of CC's and DC's rights because it has not pled the material terms of the assignments nor attached them to the complaint.[35]  Defendants also argue that Care First's statutory penalties claims based on their purported failure to disclose documents and alleged breach of fiduciary duties fail because even valid assignments of the right to assert ERISA benefits claims do not give healthcare providers derivative standing to sue plan administrators for failure to disclose documents or breach of fiduciary duty.[36]  Stated differently, they contends that the scope of the assignments Care First received is only broad enough to confer standing to sue to recover benefits, not to recover penalties for non-disclosure or breach of fiduciary duty.  Finally, defendants argue that even if the assignments were adequately pled and by their terms assigned the right to collect payment, request disclosure of documents, and sue for breach of fiduciary duty, Care First would lack standing to assert its ERISA claims because the plan agreements have anti-assignment provisions that prohibit participants and beneficiaries from assigning claims to their medical providers.[37]

Care First counters that it has adequately alleged it is the assignee of all of CC's and DC's rights, including the right to assert the claims pled in this action, and that it need not attach a copy of the assignment documents to the complaint in order adequately to plead it has standing.[38]  Care First does not dispute that the plan agreements contain anti-assignment provisions.  Rather, it argues that defendants are estopped from relying on those provisions because Zenith represented to Care First that the plan permitted assignment.[39]  Care First also argues that defendants waived

---

[35]Motion at 6.

[36]*Id.* at 8-9.

[37]*Id.* at 7-8.

[38]Opposition at 10.

[39]*Id.* at 10-18.

15

1    their right to rely on the anti-assignment provisions by failing to produce them or rely on them

2    during the administrative process.[40]

3           Defendants reply that a party's lack of standing to sue is a defense that cannot be waived.[41]

4    As a result, they contend, it does not matter what Zenith representatives may have told Care First

5    during the alleged telephone conversations.[42]  Defendants also assert that, assuming a party's lack

6    of standing can be waived, Care First has not adequately alleged such a theory.  Finally, they

7    argue that Care First has insufficiently pled that they are estopped to rely on the anti-assignments

8    provisions because its allegation that it "inquired as to whether the Plan contains an anti-

9    assignment provisions, and was advised that it does not," is too vague.[43]

10          The court first considers whether Care First has adequately alleged that CC and DC

11   assigned their rights to bring ERISA claims to Care First before assessing whether defendants are

12   estopped to rely on the anti-assignment provisions and whether they have waived the right to

13   challenge Care First's standing to sue.

14          **1.      Whether Care First Has Adequately Alleged that CC and DD Assigned**

15                 **their Rights to Assert ERISA Claims to Care First**

16                 **a.      Legal Standard Governing Assignable Rights Under ERISA**

17          As noted, Care First's ERISA claims for benefits, penalties for failure to disclose

18   documents, and breach of fiduciary duties arise under 29 U.S.C. § 1132 and 29 C.F.R.

19   § 2560.503-1.  Section 1132(a)(1) provides that a "participant or beneficiary" may bring a civil

20   action "to recover benefits due to him under the terms of his plan, to enforce his rights under the

---

[40]*Id.* at 10.

[41]Reply at 5.

[42]*Id.*

[43]Motion at 7-8.

16

EXHIBIT A
PAGE 20

1    terms of the plan," or to collect penalties for failure to disclose documents, as set forth by §

2    1132(c).   29 U.S.C. § 1132(a)(1).[44]

3          In *Misic v. Building Service Employees Health and Welfare Trust*, 789 F.2d 1374 (9th Cir.

4    1986), the Ninth Circuit held that participants and beneficiaries are not the only ones that have

5    standing to sue under § 1132.   There, in the context of a claim for recovery of benefits brought

6    under § 1132(a)(1)(B), the court held that assignees of the rights of participants and beneficiaries

7    have derivative standing under the statute as well.   The plaintiff in *Misic* was a dentist who used

8    to recover unpaid benefits as the assignee of ERISA plan beneficiaries for whom he had provided

9    dental services.    The Ninth Circuit first considered defendants' argument that 29 U.S.C.

10   § 1056(d), which explicitly prohibits the assignment of ERISA pension benefits, likewise

11   prohibited the assignment of health care benefits claims.   The court rejected this argument, noting

12   that ERISA is silent regarding the assignability of health care benefits.   *Id.* at 1376.   It observed

13   that the policy rationale behind the statutory bar on assignment for pension benefits, i.e.,

14   "ensur[ing] that [an] employee's accrued benefits are actually available for retirement purposes,"

15   did not apply in the health care context.   Rather, the court noted, permitting the assignment of

16   benefits claims to health care providers makes it easier for plan participants to finance health care

17   and therefore advances the congressional intent behind ERISA.   *Id.* at 1376-77.

18         Defendants next argued that the dentist lacked standing because "only the parties named

19   in section 1132 have standing to sue under ERISA, and assignees are not named."   *Id.* at 1378.

20   The court also rejected this argument, relying on the federal common law governing assignments.

---

[44]The full text of § 1132(a)(1) states:
"(a) Persons empowered to bring a civil action
A civil action may be brought –
(1) by a participant or beneficiary –
(A) for the relief provided for in subsection (c) of this section, or
(B) to recover benefits due to him under the terms of his plan, to enforce his rights
under the terms of the plan, or to clarify his rights to future benefits under the terms
of the plan."   29 U.S.C. § 1132(a)(1).

EXHIBIT A
PAGE 21

It noted that defendants'

> "arguments mistakenly treat Dr. Misic as a suitor in his own right. Dr. Misic sues derivatively, as assignee of [the] beneficiaries. As paragraph 12 of the complaint alleges, Dr. Misic 'stands in the shoes of the [b]eneficiaries;' and Dr. Misic's assignors, beneficiaries under the Act, are expressly authorized by section 1132(a)(1)(B) to sue to recover benefits due under a plan. Many cases reflect the premise that a valid assignment confers upon the assignee standing to sue in place of the assignor." *Id.* at 1378.

The Ninth Circuit revisited *Misic*'s holding in *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073 (9th Cir.), amended, 234 F.3d 428 (9th Cir. 2000). There, plaintiff obtained assignments of the benefits claims of more than 600 mental health patients from various mental health care providers, who had received assignments from the patients. *Id.* at 1080. The court concluded that plaintiff lacked standing to sue. In so holding, it construed *Misic* as "creat[ing] a judicial exception to the rule that only enumerated parties may sue for benefits under Section 502(a)(1)(B)" that was limited to health care providers. *Id.* at 1081. The court interpreted *Misic*'s holding as follows:

> "In upholding the assignment of benefit claims to health care providers in *Misic*, we observed that such assignment would facilitate the receipt of health care benefits by beneficiaries because, among other things, it would (1) make 'it unnecessary for health care providers to evaluate the solvency of patients before commencing medical treatment' and (2) save beneficiaries from the burden of fronting potentially large medical bills while waiting for reimbursement from their health benefit plans. *Misic*, 789 F.2d at 1377. In other words, we granted derivative standing to health care providers not because we believed that federal common law on derivative standing trumps the plain language of Section 502. We granted it because permitting health care providers to sue in place of the beneficiaries they had treated was consistent with Congressional intent in enacting ERISA." *Id.*

1    The court reasoned that allowing assignees of assignees to pursue benefits claims under ERISA

2    "would be tantamount to transforming health benefit claims into a freely tradable commodity,"

3    and would "allow third parties with no relationship to the beneficiary to acquire claims solely for

4    the purpose of litigating them."  *Id.*  Because "such a result would [not] further ERISA's

5    purpose," the Ninth Circuit concluded that assignees of health care provider assignees of

6    beneficiaries lacked standing to sue derivatively under ERISA.  *Id.*

7         The Ninth Circuit has not expressly decided whether assignees can sue to recover penalties

8    for non-disclosure and breach of fiduciary duty.  *Eden Surgical Center*, 420 Fed. Appx. at 697

9    ("assuming (without deciding) that the right to bring claims under § 1132(c) is free-standing and

10   may be assigned").  Applying *Misic* and *Simon*, however, concluding that health care providers

11   who receive an assignment from their patients have standing to assert such claims would further

12   ERISA's purpose.  Allowing health care providers to request that plans make the disclosures

13   mandated by ERISA, to seek penalties in the event of non-disclosure, and to sue for breach of

14   fiduciary duty for misrepresentations concerning the scope of coverage would not "transform[ ]

15   health benefit claims into a freely tradable commodity," which was the *Simon* court's concern, but

16   would instead "facilitate the receipt of health care benefits by beneficiaries," which was the basis

17   on which the *Misic* court determined that health care providers have standing to seek benefits.

18        In *Hughes Salaries Retirees Action Committee v. Administrator of Hughes Non-Bargaining

19   Retirement Plan*, 72 F.3d 686 (9th Cir. 1995), the Ninth Circuit noted that disclosure is a

20   mechanism designed to assist with enforcement of the right to recover benefits.  It explained that

21   ERISA's disclosure requirements are intended to ensure "that individual participants and

22   beneficiaries will be armed with enough information to enforce their own rights as well as the

23   obligations owed by the fiduciary to the plan in general."  *Id.* at 690 n. 3.  Assignment of the right

24   to obtain the information necessary to pursue benefits claims to an individual's health care

25   provider therefore facilitates the receipt of health care benefits.  Accordingly, the court concludes

26   that under *Misic*, *Simon*, and *Hughes*, ERISA beneficiaries may assign their right to receive

27   mandated disclosures, and the accompanying right to sue for penalties in the event of non-

28   disclosure.  Indeed, other district courts have recognized that derivative standing exists to pursue

1   penalties for non-disclosure.  See *DeBartolo v. Blue Cross/Blue Shield of Illinois*, No. 01 C 5940,

2   2001 WL 1403012, *5 (N.D. Ill. Nov. 9, 2001) ("An assignee's right to sue under 29 U.S.C.

3   § 1132(a)(1)(B) extends to 29 U.S.C. § 1132(a)(1)(A)," citing *Loretto Hosp. v. Local 100-A*

4   *Health and Welfare*, Civ. No. 97 C 1353, 1998 WL 852878, *9 (N.D. Ill. Dec. 4, 1998) and

5   *Alexian Bros. Med. Ctr. v. South Lorain Merchants Health and Welfare Plan*, Civ. No. 98 C

6   0559, 1998 WL 911783, *4 (N.D. Ill. Dec. 24, 1998)); *University of Tennessee William F. Bowld*

7   *Hosp. v. Wal-Mart Stores*, 951 F.Supp. 724, 725 n. 1 (W.D. Tenn. 1996) (holding that the

8   recipient of a valid assignment could pursue a claim against the plan administrator for statutory

9   penalties under § section 1132(c)); *Protocare of Metropolitan N.Y., Inc. v. Mutual Ass'n*

10  *Administrators*, 866 F.Supp. 757, 762 (S.D.N.Y. 1994) ("Plaintiff, as an assignee. . . has

11  standing to sue Mutual under § 502(c) of ERISA").

12      In *Texas Life, Accident Health & Hospital Service Insurance Guaranty Association v.*

13  *Gaylord Entertainment Co.*, 105 F.3d 210, 215 (5th Cir. 1997), moreover, the Fifth Circuit

14  recognized that medical providers who have taken an assignment have standing to sue for a breach

15  of fiduciary duty related to an ERISA pension plan.  The court first held that such claims were not

16  barred by ERISA's anti-assignment provision for pension plans because that provision prohibits

17  the assignment of pension benefits, not the right to sue for breach of fiduciary duty.  *Id.*  It next

18  observed that "[a]llowing derivative standing to assignees of breach of fiduciary duty claims does

19  not frustrate ERISA's purpose," but rather "advances ERISA's goal of safeguarding pension

20  funds."  For that reason, it held that assignments of the right to sue for breach of fiduciary duty

21  are valid under ERISA.  *Id.*

22      Here, as in *Gaylord*, allowing the assignment of a breach of fiduciary duty claim would

23  advance ERISA's purpose by facilitating the provision of health care services.  Cf. *In re*

24  *WellPoint, Inc. Out-of-Network UCR Rates Litigation* (*WellPoint II*), 903 F.Supp.2d 880, 896

25  (C.D. Cal. 2012) (considering whether assignments of the right to recover benefits were

26  sufficiently broad in scope to grant the assignee standing to sue for breach of fiduciary duty); *In*

27  *re WellPoint, Inc. Out-of-Network UCR Rates Litigation* (*WellPoint I*), 865 F.Supp.2d 1002, 1043

28  (C.D. Cal. 2011) (denying a motion to dismiss a breach of fiduciary duty claim brought by an

assignee).  Accordingly, the court concludes that the ERISA rights Care First asserts in this action are assignable.[45]

_____

[45]At the hearing, defendants argued that Care First's breach of fiduciary duty claim failed under *Moyle v. Liberty Mutual Retirement Benefit Plan*, 985 F.Supp.2d 1247 (S.D. Cal. 2013). In *Moyle*, the court reviewed plaintiffs' breach of fiduciary duty claim under § 1132(a)(3). Section 1132(a)(3) provides that a "participant, beneficiary, or fiduciary [may] . . . enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or . . . obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."  29 U.S.C. § 1132(a)(3).  The *Moyle* plaintiffs sought to recover benefits under § 1132(a)(1)(B) and also asserted a breach of fiduciary duty claim under § 1132(a)(3).  The breach of fiduciary duty claim sought an order reforming the plan in accordance with purported misrepresentations defendants made so that plaintiffs could recover past unpaid benefits.  *Id.* at 1268.  The court noted that § 1132(a)(3) was a "catchall provision" that does not apply if adequate relief is available under § 1132(a)(1)(B) – whether or not a plaintiff succeeds on the § 1132(a)(1)(B) claim – and that "'appropriate equitable relief' [under § 1132(a)(3)] does not authorize suits for money damages for breach of fiduciary duty."  *Id.* at 1266.  The court therefore held that plaintiffs had an adequate remedy under § 1132(a)(1)(B), and that their requested relief under § 1132(a)(3) was, "in essence," a request for "monetary relief for their denial of past service credit benefits under the Plan."  *Id.* at 1268.  Consequently, it granted summary judgment in favor of defendants on plaintiffs' breach of fiduciary duty claim.  *Id.*

Defendants did not move to dismiss Care First's breach of fiduciary duty claim under *Moyle* in their motion to dismiss.  Instead, they argued that the claim failed under *WellPoint II* (see Motion at 9 (citing *WellPoint II*, 903 F.Supp.2d at 895-97)), which held that the assignments in that case were not sufficiently broad to cover a breach of fiduciary duty claim.  See *WellPoint II*, 903 F.Supp.2d at 895-97.  The court addresses the scope of the assignments involved here *infra*. In a footnote in their reply, defendants cite *Moyle* and, for the first time,  make a one-sentence argument that Care First's breach of fiduciary duty claim fails under that case because it seeks damages.  (See Reply at 3-4 n. 3.)  Care First did not have an opportunity to respond to this argument and the court will not consider new arguments made in reply when the opposing party has not had an opportunity to respond.  See *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief"); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("[W]here new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond"); *Docusign, Inc. v. Sertifi, Inc.*, 468 F.Supp.2d 1305, 1307 (W.D. Wash. 2006) ("It is well established that new arguments and evidence presented for the first time in Reply are waived"); *Iconix, Inc. v. Tokuda*, 457 F.Supp.2d 969, 976 (N.D. Cal. 2006) (sustaining an objection to new evidence and argument submitted with a plaintiff's reply).  This is especially true where the new argument asserts that a claim should be dismissed on an entirely new basis not mentioned in the moving papers.  Accordingly, the court declines to dismiss Care First's breach of fiduciary duty claim on the basis that it seeks to recover damages.  If, given the court's holding in *Moyle*, Care First elects to replead its breach of

21

**b.** **Whether Care First Has Adequately Alleged It Received Assignments from CC and DC**

As noted, defendants argue that Care First has not adequately alleged that CC and DC assigned their rights to sue for benefits, seek penalties for non-disclosure, and assert a claim for breach of fiduciary duty to Care First. "[C]ourts must look to the language of an ERISA assignment itself to determine the scope of the assigned claims." *WellPoint II*, 903 F.Supp.2d at 896; see also *Eden Surgical Center*, 420 Fed.Appx. at 697 ("[T]he question is whether the plan participants assigned Eden the right to sue for statutory penalties, independent from a claim for benefits"). "'[O]nly an express and knowing assignment of an ERISA fiduciary breach claim [under § 1132(a)(2)] is valid.'" *WellPoint II*, 903 F.Supp.2d at 896 (citing *Gaylord*, 105 F.3d at 218 (second internal alteration original)).

Care First alleges that "[p]rior to receiving medical care from Care First, the Plan Participants assigned their benefits and ERISA representative rights under the Plan to Care First." This language, standing alone, is insufficient to allege that CC and DC assigned Care First the right to bring the claims it asserts in this lawsuit. As noted, however, the court can consider the text of the three assignments under the incorporation by reference doctrine. They provide, in relevant part:

> "The undersigned hereby appoints and designates Care First Surgical Center as my duly authorized representative, and assigns my ERISA rights and plan benefits as described below. This assignment is effective during any legal or administrative process relating to any claim submitted on my behalf, which shall include, but is not limited to . . . any legal process relating to a claim submitted on my behalf for health insurance benefits; and/or [ ] any request for disclosure of documents and/or materials relating to a claim submitted on my behalf. . . . I hereby assign my right to assert any and all causes of action for judicial review to Care First Surgical

---

fiduciary duty claim in a first amended complaint, defendants may raise this argument in a later motion to dismiss, and the court will consider the merits of the argument with the benefit of full briefing on the matter.

EXHIBIT A
PAGE 26

Center. . . . My assignee may 'stand in my shoes', [sic] as that phrase is understood under assignment law. I intend for my personal standing under ERISA's disclosure and civil enforcement procedures under 29 U.S.C. §§ 1024 and 1132 to be hereby transferred to my assignee, so that it may seek judicial review of denied claims and/or disclosure under 29 U.S.C. § 1132(a)(1)(B), 29 U.S.C. § 1132(a)(1)(A), and/or 29 C.F.R. 2560.503-1. This assignment specifically includes an assignments of my rights to seek relief as a claimant under 29 U.S.C. § 1132(c) and my rights to seek attorney fees under 29 U.S.C. § 1132(g). . . . The assignment of benefits and ERISA rights by me is complete: I retain no interest in the benefits and/or rights due to me under these claims for medical care and/or facility fees."[46]

The language of the assignments is sufficiently broad to cover claims not only for recovery of unpaid benefits but also claims seeking penalties for non-disclosure and asserting a breach of fiduciary duty by the plan administrator. Indeed, the assignments specifically state that CC and DC assign their rights to sue for penalties under § 1132(a)(1)(A) and to recover benefits under § 1132(a)(1)(B). The assignments also cover claims for breach of fiduciary duty under § 1132(a)(2) because they grant Care First all of CC's and DC's "ERISA rights," including the right to institute "any legal process relating to a claim submitted on [CC's or DC's] behalf for health insurance benefits" and "all causes of action for judicial review." They also explicitly state that CC and DC "intend for [their] personal standing under ERISA's disclosure and civil enforcement procedures under 29 U.S.C. §§ 1024 and 1132 to be [ ] transferred to" Care First. The assignments, moreover, provide that Care First is to stand in CC's and DC's "shoes."

In *WellPoint*, the plaintiff medical providers, who sued as assignees, alleged claims, *inter alia*, for unpaid benefits under § 1132(a)(1)(B) and breach of fiduciary duty under § 1132(a)(2). The defendants challenged the scope of the assignments alleged in the complaint. The complaint pled that "Dr. Henry's patients sign a form assigning their health benefits to him," "Dr. Peck has

---

[46]Reich Decl., Exhs. 4 (November Email), 5 (December Email), and 6 (January Email).

1   obtained assignments of benefit payment rights from insureds," "Dr. Peck and Provider Class
2   members obtain" an "assignment of benefits forms" "from their WellPoint patients," and "[i]n
3   each case, Dr. Kavali [obtains] from the patient [a] signed Assignment of Benefits form."
4   *WellPoint*, 903 F.Supp.2d at 896.  The court held that the language of the assignments was
5   limited to the recovery of benefits and that plaintiffs therefore lacked standing to sue for breach
6   of fiduciary duty.  *Id.*  The court contrasted the assignments at issue in the case with the
7   assignment in *Misic*, which stated that "'Dr. Misic "stands in the shoes of the [b]eneficiaries."'"
8   *WellPoint*, 903 F.Supp.2d at 896 (citing *Misic*, 789 F.2d at 1378 (alteration original)).  It noted
9   that "[u]nder California law, when an assignee 'stands in [the] shoes of the assignor, he takes 'all
10  the rights of the assignor' and has exclusive rights to sue on the assigned claims."  *Id.* (citing
11  *Johnson v. County of Fresno*, 111 Cal.App.4th 1087, 1096 (2003)).  The court concluded that
12  "[b]ecause the scope of the assignments as pleaded is limited to the right to collect benefits
13  payments directly, . . . the Court finds the allegations insufficient to conclude that the Provider
14  Plaintiffs were assigned the right to pursue [ ] claims" for breach of fiduciary duty.  *Id.*

15          Here, as noted, the assignments specifically grant Care First the right to bring claims under
16  the civil enforcement provisions of ERISA, § 1132, and state that Care First is to stand in the
17  shoes of CC and DC.  Under *Misic* and *WellPoint*, this language is sufficiently explicit to confer
18  standing on Care First to sue not only for recovery of benefits, but also to seek penalties for non-
19  disclosure and assert that the plan administrator has breached its fiduciary duty.  See also *Eden*,
20  420 Fed. Appx. at 697 (Bybee, J., dissenting) ("The assignments at issue in these cases expressly
21  assign Eden the right to 'assert ALL causes of action for judicial review' on behalf of the
22  assignors.  The comprehensive scope of the assignment is further underscored by language
23  providing that Eden may 'Stand in [the] shoes' of the assignors, 'as that phrase is understood
24  under assignment law.'  Under California law, when an assignee 'stands in the shoes' of the

25
26
27
28

EXHIBIT A
PAGE 28

1    assignor, he takes 'all the rights of the assignor' and has exclusive rights to sue on the assigned

2    claims").[47]

3                    **2.**       **Whether Defendants Are Estopped from Relying or Have Waived Their**

4                           **Right to Rely on the Anti-Assignment Provisions of the Plan Agreements**

5         Defendants argue that even if Care First has adequately alleged that it received assignments

6    of the right to bring the claims it asserts, the plan agreements contain enforceable anti-assignment

7    provisions, which prohibit a plan participant or beneficiary from assigning rights to their health

8    care providers. The ILWU-PMA Welfare Agreement provides that "[n]o Benefits, monies or

9    property of the Welfare Fund shall be subject in any manner to anticipation, alienation, sale,

10   transfer, assignment, pledge, encumbrance, or charge by any Longshoreman, Pensioner, Social

11   Security Retiree, or any other person for any purpose other than by the Trustees for purposes

12   herein provided, and any attempt to do so shall be void."[48]

13         The ILWU-PMA Welfare Plan Summary Plan Description ("SPD") provides that "[u]nder

14   provisions of the Welfare Plan, Welfare Plan benefits are not subject to assignment by a

15   participant, beneficiary or any other person except the Trustees, and any attempt to do so shall be

16   void."[49]

17

---

18        [47]In *Eden*, the Ninth Circuit held that despite the broad language of the assignments, they

19   did not convey the right to sue for non-disclosure penalties. 420 Fed. Appx. at 697. The majority

20   noted that the assignments were explicitly limited to "any legal process, necessary to collect claims

      submitted on [the participant's] behalf for health insurance benefits, but denied by [the] plan.'"

21   *Id.* (internal alterations original). Because the plaintiff did not "seek[ ] 'judicial review of denied

22   claims,' and the claim for relief [was] not asserted during any 'legal process, necessary to collect

      claims submitted on [the participant's behalf] for health insurance benefits, but denied by [the]

23   plan'" the majority held that plaintiff lacked derivative standing to sue for non-disclosure

      penalties. *Id.* (third and fourth alteration in original). The assignments at issue here, by contrast,

24   specifically reference the right to seek disclosure and the statute that provides for penalties if there

      is a failure to disclose.

25

26        [48]Declaration of John Barton in Support of Defendants' Motion to Dismiss ("Barton

      Decl."), Docket No. 8-1 (Mar. 28, 2014), Exh. 1 at 110 (ILWU-PMA Welfare Agreement,

27   ¶ 6.24)).

28        [49]*Id.*, Exh. 2 at 273 (SPD, Assignment).

Following *Misic*, the Ninth Circuit decided in *Davidowitz v. Delta Dental Plan of California, Inc.*, 946 F.2d 1476 (9th Cir. 1991), that because Congress "carefully considered the subject and chose to remain silent," it must have "intended not to mandate assignability, but [ ] instead to allow the free marketplace to work out such competitive, cost effective, medical expense reducing structures as might evolve." *Id.* at 1480-81. The *Davidowitz* court thus concluded that "ERISA welfare plan payments are not assignable in the face of an express non-assignment clause in the plan." *Id.* at 1481; see also *Long Beach Memorial Medical Center v. California Mart Employee Benefit Plan*, 172 F.3d 57, 1999 WL 109642, *1 (9th Cir. Feb. 26, 1999) (Unpub. Disp.) ("Because this court has held that non-assignment clauses are valid under ERISA, the district court did not err by concluding that Medical Center failed to state a claim because it lacked standing"); *Spinedex Physical Therapy, U.S.A., Inc. v. United Healthcare of Arizona, Inc.*, No. CV-08-00457-PHX-ROS, 2012 WL 8169880, *4 (D. Ariz. Oct. 19, 2012) ("It is well established that anti-assignment clauses are valid and enforceable," citing *Davidowitz*, 946 F.2d at 1480-81); *Angel Jet Services, LLC v. Giant Eagle, Inc.*, No. CV 09-01489-PHX-MHM, 2010 WL 1266831, *4 (D. Ariz. Mar. 29, 2010) ("The Ninth Circuit has held that an ERISA beneficiary may confer standing on its assignee when such assignments are not prohibited by the plan and are not conferred upon non-health providers").

As noted, Care First does not dispute that the anti-assignment clauses in the plan agreements at issue here prohibit a participant or beneficiary from assigning his or her rights and claims to a medical provider.[50] Under *Davidowitz*, these clauses preclude a health care provider from obtaining derivative standing. Care First contends, however, that defendants are estopped from relying on, or have waived their right to assert, the anti-assignment provisions because

---

[50]The language of the anti-assignment provisions appears only to prevent the assignment of a participant's or beneficiary's claim for benefits, not his or her right to request disclosure of documents, seek penalties for non-disclosure, or sue for breach of fiduciary duty. Care First does not address this issue in its opposition. Accordingly, for purposes of this motion only, the court assumes the scope of the anti-assignment provisions includes all of Care First's ERISA claims.

EXHIBIT A
PAGE 30

1   Zenith allegedly misrepresented that the plan agreements permit assignments, and because
2   defendants did not raise the anti-assignment provisions prior to initiation of this lawsuit.[51]

3           **a.      Whether Defendants are Estopped from Raising the Anti-**
4                     **Assignment Provisions**

5                   **i.      Legal Standard Governing Estoppel of Attacks on**
6                            **Derivative Standing in ERISA Cases**

7           The Ninth Circuit has recognized that estoppel principles can apply to an ERISA
8   beneficiary's substantive claim for recovery of benefits.  See, e.g., *Gabriel v. Alaska Electric*
9   *Pension Fund*, ___ F.3d ___, 2014 WL 2535469, *6-7 (9th Cir. June 6, 2014) (stating that
10  "'appropriate equitable relief' may include the remedy of equitable estoppel, which holds the
11  fiduciary 'to what it had promised' and '"operates to place the person entitled to its benefit in the
12  same position he would have been in had the representations been true,"'" quoting *CIGNA Corp.*
13  *v. Amara*, ___ U.S. ____, 131 S. Ct. 1866, 1880 (2011), and discussing the "additional
14  requirements" that an ERISA plaintiff must meet to invoke equitable estoppel); *Pisciotta v.*
15  *Teledyne Industries, Inc.*, 91 F.3d 1326, 1331 (9th Cir. 1996) ("An ERISA beneficiary may
16  recover benefits under an equitable estoppel theory upon establishing a material misrepresentation,
17  reasonable and detrimental reliance upon the representation and extraordinary circumstances.  The
18  Ninth Circuit has imposed two additional prerequisites on a plaintiff attempting to allege a claim
19  of equitable estoppel in an ERISA action.  First, the provisions of the plan at issue must be
20  ambiguous such that reasonable persons could disagree as to their meaning or effect.  Second,
21  representations must be made to the employee involving an oral interpretation of the plan").  In
22  *Gabriel*, the Ninth Circuit reiterated the standard a plaintiff must satisfy to obtain relief on the
23  basis of equitable estoppel:

24          "Under th[e] [equitable estoppel] theory of relief, '(1) the party to be estopped must
25          know the facts; (2) he must intend that his conduct shall be acted on or must so act
26          that the party asserting the estoppel has a right to believe it is so intended; (3) the

27          ───────────────
28          [51]Opposition at 10-18.

27

1  latter must be ignorant of the true facts; and (4) he must rely on the former's

2  conduct to his injury.'" 2014 WL 2535469 at *7.

3  The court noted that in addition to "the traditional equitable estoppel requirements," a party

4  asserting estoppel "must also allege: (1) extraordinary circumstances; (2) 'that the provisions of

5  the plan at issue were ambiguous such that reasonable persons could disagree as to their meaning

6  or effect'; and (3) that the representations made about the plan were an interpretation of the plan,

7  not an amendment or modification of the plan." *Id.* It noted that the Ninth Circuit had not

8  defined "extraordinary circumstances," but that, in the ERISA context, "courts have held that

9  making 'a promise that the defendant reasonably should have expected to induce action or

10  forbearance on the plaintiff's part,' as well as 'conduct suggesting that [the employer] sought to

11  profit at the expense of its employees,' a 'showing of repeated misrepresentations over time,' or

12  evidence 'that plaintiffs are particularly vulnerable,' can constitute extraordinary circumstances."

13  *Id.* (citing *Devlin v. Empire Blue Cross & Blue Shield,* 274 F.3d 76, 86 (2d Cir. 2001), and *Kurz*

14  *v. Philadelphia Electric Co.*, 96 F.3d 1544, 1553 (3d Cir. 1996) (alteration original)).

15      The Ninth Circuit has not expressly addressed how estoppel applies to the threshold

16  question of derivative standing, however. Those courts that have considered the question have

17  applied estoppel in addressing standing, although, as discussed *infra*, they have not required that

18  plaintiff make the additional showing the Ninth Circuit mandates in the context of recovery of

19  benefits. See *Riverview Health Institute LLC v. Medical Mutual of Ohio*, 601 F.3d 505, 521-22

20  (6th Cir. 2010) (noting that estoppel can be invoked to preclude reliance on an anti-assignment

21  clause, but holding that plaintiff had not adequately shown an entitlement to estoppel); *Hermann*

22  *Hosp. v. MEBA Medical and Benefits Plan*, 959 F.2d 569, 574-75 (5th Cir. 1992) (holding that

23  because an insurance company had mailed a patient a form that "expressly provided that benefits

24  payable under the Plan could be assigned and that assignment could be effectuated by the

25  participant's completion of [a portion of the form] – which is exactly what Mr. Nicholas, as the

26  plan participant, did"; because the insurance company had allowed the hospital to rely

27  detrimentally on its assurance that it was merely investigating the claim while postponing payment;

28  and because it had "failed to assert the anti-assignment clause until more than three years after [the

28

hospital] first requested payment, it [was] estopped to do so now"), overruled on other grounds, *Access Mediquip, L.L.C. v. UnitedHealthcare Insurance Co.*, 698 F.3d 229 (5th Cir. 2012); *Productive MD, LLC v. Aetna Health, Inc.*, 969 F.Supp.2d 901, 918-23 (M.D. Tenn. 2013) (holding that a plan was estopped from raising anti-assignment clauses in the plan agreements); *North Jersey Brain and Spine Center v. Saint Peter's University Hospital*, Civil Action No. 13–74 (ES), 2013 WL 5366400, *7 (D.N.J. Sept. 25, 2013) (holding that an ERISA plan was "estopped from disavowing Plaintiff's standing" to sue under an anti-assignment clause); *Gregory Surgical Services, LLC v. Horizon Blue Cross Blue Shield of New Jersey, Inc.*, Civil Action No. 06-0462 (JAG), 2007 WL 4570323, *4 (D.N.J. Dec. 26, 2007) (finding that a plan's actions in "discuss[ing] patient coverage under health care policies, direct[ing] submission of claim forms, direct[ing] reimbursement of medical costs, and engag[ing] in appeal processes . . . impede[d] [its] ability to rely on the anti-assignment provision to challenge GSS's standing").[52]

### ii. Whether Care First Has Adequately Alleged Defendants Are Estopped from Raising the Anti-Assignment Provisions in the Plan Agreements

Beyond arguing that Care First's allegation concerning the assurances of assignability it received from Zenith representatives is too vague, defendants do not challenge the adequacy of

---

[52]Defendants argued at the hearing that applying estoppel or waiver principles to bar a plan from raising an unambiguous anti-assignment provision would fundamentally change ERISA because it would result in rewriting unambiguous terms of ERISA plans. The court disagrees. Estoppel and waiver are equity principles and apply only when it would be unfair to enforce the provisions of a plan as written. As all courts recognizing estoppel or waiver arguments in the face of unambiguous anti-assignment provisions have recognized, where the assignee of benefits does not have access to plan documents and where a plan makes misrepresentations regarding the provisions of those documents, it would be inequitable to allow the plan later to rely on those provisions to defeat a plaintiff's claim. The court therefore disagrees with defendants that where a plaintiff alleges it did not have access to plan documents and the defendant made misrepresentations regarding the provisions of those documents, the plaintiff has no remedy under ERISA if the plan documents are unambiguous and can prosecute only on state law claims.

29

EXHIBIT A
PAGE 33

1   Care First's pleading of the traditional requirements for equitable estoppel.[53]  Nor do they assert

2   that the case does not present extraordinary circumstances.  Instead, they contend that Care First

3   cannot estop them from relying on the anti-assignment provisions in the plan agreements because

4   this would result in the modification of the unambiguous written terms of an ERISA plan.[54]

5        Addressing defendants' challenge to the clarity of the pleadings first, the court disagrees

6   that Care First's allegations concerning the statements Zenith representatives purportedly made

7   are inadequate.  Care First alleges that "[p]rior to providing medical care to the two Plan

8   Participants . . . [it] inquired [during recorded conversations] . . . whether the Plan contain[ed]

9   an anti-assignment provision, and was advised that it [did] not."[55]  There is nothing vague,

10   conclusory, or ambiguous about this allegation.  Care First's claims are not subject to a heightened

11   pleading standard, such that it must allege the who, what, when, where, and how of these

12   communications.  Rather, it need only satisfy Rule 8(a).  Under *Iqbal* and *Twombly*, Care First

13   has adequately pled that Zenith representatives told it that the plan agreements did not prohibit

14   assignment.

15        Defendants next assert that Care First cannot adequately plead that they are estopped to rely

16   on the anti-assignment provisions because the terms of the plan agreements are unambiguous and

17   Zenith's alleged representation conflicts with the express plan terms.  The court finds the

18   argument unpersuasive.  As noted, the Ninth Circuit has not yet addressed equitable estoppel in

19   the derivative standing context.  In *Riverview*, however, the Sixth Circuit appeared to reject the

20   argument defendants make here by implicitly recognizing an exception to the general requirement

21   that a plaintiff cannot use estoppel to vary the unambiguous terms of a plan agreement where the

22   plan documents have neither been furnished nor made available to participants and beneficiaries.

23

24

25       [53]Motion at 7-8.  For purposes of this motion, therefore, the court assumes that Care First

has adequately alleged extraordinary circumstances as well as all of the traditional requirements

26   for asserting equitable estoppel.

27       [54]*Id.* at 8; Reply at 6.

28       [55]Complaint, ¶ 12.

EXHIBIT A
PAGE 34

The *Riverview* plaintiffs, medical providers seeking to bring derivative claims, argued that under *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) (en banc), the plan was estopped to rely on an anti-assignment provision because it failed to show that it affirmatively told participants and beneficiaries about the provision or provided documentation of it to them. *Riverview*, 601 F.3d at 521-22. Plaintiffs submitted affidavits from insureds stating "not [ ] that [the plan] failed to furnish or make available the documents containing the anti-assignment provision [but that] . . . the insureds were never advised, informed, or told that they could not assign their health care benefits." *Id.* at 522. The *Riverview* court rejected the argument, stating "[w]e do not think *Sprague* supports Plaintiffs' argument. *Sprague* merely says that a party's reliance can rarely, if ever, be reasonable or justifiable if such reliance is 'inconsistent' with the clear and unambiguous terms of plan documents *available to or furnished to the party*.'" *Id.* (citing *Sprague*). Because "[n]one of the insureds claim[ed] that Medical Mutual deprived them of access to the documents containing the anti-assignment language," the court concluded, "[p]laintiffs' argument fails." *Id.*

In *Productive MD, LLC v. Aetna Health, Inc.*, 969 F.Supp.2d 901, 922-23 (M.D. Tenn. 2013), the court relied on this discussion in *Riverview*, and held that a plan was estopped from arguing that a medical provider's assignments were void under an anti-assignment clause in the plan agreement because the provider alleged that it did not have access to the underlying plans, the plan had in the past made payments to the provider when it requested reimbursement on hundreds of claims, and had never raised the invalidity of the assignments as an issue. It asserted that all of these facts caused it reasonably to rely on the fact that the assignments were valid and to continue to provide medical services to plan participants and beneficiaries. The court concluded the provider's reliance was reasonable because "[h]ad Aetna challenged Productive MD's assignments at any stage . . . Productive MD might have acted differently[.] . . . [For example], if Aetna had challenged Productive MD's claims for payment on the grounds that an underlying policy prohibited assignment, Productive MD would have been on notice not to perform tests without having the patients first confirm that they could assign their rights to Productive MD." *Id.* at 923. It held:

EXHIBIT A
PAGE 35

1   "These circumstances satisfy the five-factor test for equitable estoppel set forth in
2   *Sprague*: (1) Aetna's conduct [in approving claims submitted by assignees in the
3   past] plausibly amounted to a representation that Productive MD's patient
4   assignments were acceptable both generally and under the specific plan terms;
5   (2) Aetna, in purporting to administer the underlying policies, was presumptively
6   aware of the underlying policy terms; (3) Productive MD reasonably construed
7   Aetna as indicating that Productive MD could continue to receive payment from
8   Aetna for any medically necessary tests covered by the applicable insurance plan;
9   (4) to the extent that any policies restricted or prohibited assignment, Productive
10  MD was not aware – either actually or constructively – of the underlying plan
11  terms; and (5) Productive MD reasonably relied upon Aetna's conduct to its
12  potential detriment in performing tests without demanding payment up front or
13  requiring its patients to inquire about their right to assign before receiving tests."
14      *Id*. at 924.

15      In *Hermann*, the Fifth Circuit held that a plan was estopped from raising an anti-assignment
16  provision in its plan agreement. 959 F.2d 569. The plaintiff, a hospital to whom a patient had
17  assigned her rights under ERISA, had called the plan when the patient was first admitted and had
18  been told by the plan that the patient was covered. *Id*. at 574. During the six months the patient
19  was in the hospital, the hospital repeatedly attempted to obtain payment for the services it was
20  providing, but the plan continuously postponed payment, asserting only that it was "investigating"
21  the claim. *Id*. Three years after the patient's death, the hospital filed suit to recover benefits; at
22  that point, the plan raised the anti-assignment clause for the first time. *Id*. The court held that
23  the plan was estopped to rely on the provision because "[t]he anti-assignment clause was contained
24  in the documentation establishing the Plan," but the hospital, "which was not privy to the Plan,
25  had no opportunity to review that documentation." *Id*. The court imposed an affirmative duty
26  on the plan to "notify [the hospital] of th[e] [anti-assignment] clause if it intended to rely on it to
27  avoid any attempted assignments," and concluded that the plan was estopped from raising the anti-
28  assignment provision in light of its "protracted failure to assert the clause when [the hospital]

32

requested payment pursuant to a clear and unambiguous assignment of payments for covered benefits. *Id.* at 574-75.[56]

---

[56]Defendants argued in their reply, and reiterated at the hearing, that the Fifth Circuit subsequently limited *Hermann* in *LeTourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc.*, 298 F.3d 348 (5th Cir. 2002). (See Reply at 13-14.) Unlike defendants' other arguments asserted for the first time in reply or at the hearing, this argument was properly raised, as it responded to Care First's reliance on *Hermann* in its opposition. See *United States v. Taibi*, No. 10–CV–2250 JLS, 2012 WL 553143, *4 (S.D. Cal. Feb. 21, 2012) ("[B]ecause the[ ] documents respond directly to Defendant's allegations made in his opposition brief, the Court finds it may properly consider this rebuttal evidence even though it was offered for the first time in Plaintiff's reply brief," citing *EEOC v. Creative Networks, LLC and Res–Care, Inc.*, No. CV–05–3032–PHX–SMM, 2008 WL 5225807, *2 (D. Ariz. Dec. 15, 2008) (reviewing the rule that a party may not provide "new" evidence in reply and deprive the opposing party of an opportunity to respond, but denying a motion to strike because the challenged evidence was not "new," as it properly rebutted arguments raised in opposition to a motion for summary judgment)); see also *Aguirre v. Munk*, No. C 09–763 MHP, 2011 WL 2149087, *13 (N.D. Cal. June 1, 2011) ("There was no new evidence in defendants' reply. Any shift in focus between the motion and the reply was responsive to Aguirre's arguments and 'evidence' in opposition that were different from the allegations in the amended complaint"); *QBAS Co., Ltd. v. C Walters Intercoastal Corp.*, No. SACV 10–406 AG, 2010 WL 7785995, *3-4 (C.D. Cal. Dec. 16, 2010) ("Defendants argue that new evidence submitted for the first time with a Reply brief should not considered. This issue arises frequently, and it's sometimes tricky to distinguish between impermissible 'new' evidence in a reply and evidence that is permissibly responsive to an argument made in the opposing party's opposition. In this case, the issue is not so tricky. Plaintiffs' evidence . . . submitted with their Reply is clearly permissible evidence responsive to Defendants' . . . arguments. Thus, the . . . objections are OVERRULED"); *Bell v. Santa Ana City Jail*, No. SA CV 07-1218-ODW, 2010 WL 582543, *1 n. 3 (C.D. Cal. Feb. 16, 2010) ("The Court concurs with defendant that the evidence adduced in her Reply raises no new issues and consists solely of a response to the arguments that plaintiff first raised in his Opposition").

The court disagrees with defendants' contention that *LeTourneau* limited the holding in *Hermann*, however. The *LeTourneau* court recognized that *Hermann* held that the anti-assignment provision at issue in that case was ineffective to preclude the enforceability of an assignment on two bases – first, that "[t]he ERISA Plan was estopped from enforcing its anti-assignment clause because of the Plan's protracted failure to assert anti-assignment when the hospital requested payment under an assignment of payment provision for covered benefits," and second, "that the anti-assignment clause there at issue would not preclude the hospital's recovery from the plan because *the clause applied only to unrelated, third-party assignees*, such as creditors who might attempt to obtain voluntary assignments to cover debts having no nexus with a plan[.]" *LeTourneau*, 298 F.3d at 351 (citing *Hermann*, 959 F.2d at 569). The district court in *LeTourneau* had relied on the second holding in *Hermann* to conclude that an assignment clause was unenforceable despite the fact that the assignment clause at issue in *LeTourneau* "[i]n no way

33

*Sprague*, *Riverview*, *Hermann*, and *Productive MD* all recognize – explicitly or implicitly – that the principle that a representation that conflicts with the unambiguous terms of a plan agreement will not support estoppel does not apply in the derivative standing context if the assignee can show that it did not have, and could not have gained, access to the plan agreements. They stand for the proposition that a medical provider that asserts an administrator is estopped from relying on an anti-assignment provision in the plan will be deemed to have reasonably relied on the administrator's statements concerning the assignability of rights under the plan so long as the plan agreements were not furnished or made available to the provider, either by the plan or by the participant-assignors.[57]

resembl[ed]" the language of the clause at issue in *Hermann*. *Id.* at 351. The Fifth Circuit therefore clarified that *Hermann* does not stand "for the proposition that all anti-assignment clauses are *per se* invalid vis-a-vis providers of health care services." *Id.* at 352. It also noted that nothing in *Hermann* mandates that "any putative assignment somehow grants derivative standing to the provider, as an assignee, to sue on behalf of or standing in the shoes of the plan's beneficiary" if there is a valid and enforceable anti-assignment provision in the plan. *Id.* These statements clarify, not limit, the holding in *Hermann*; to the extent *LeTourneau* is applicable, its reaffirmance of *Hermann*'s first holding supports Care First's argument that a plan can be estopped from enforcing an anti-assignment clause.

[57]Defendants argue that *Riverview* stands for the proposition that a plan can be estopped from raising an anti-assignment provision only if the assignee pleads that plan participants and beneficiaries to whom it provides services did not had access to the plan documents. (Reply at 9.) The court disagrees that *Riverview* precludes a finding of estoppel only under those circumstances. The court's holding that plaintiffs failed to show that defendant was estopped from raising the anti-assignment provision was framed as a response to plaintiffs' argument that they had adequately shown an estoppel because defendants never affirmatively told plan participants of the provision. The court noted that there was no authority requiring that defendant affirmatively alert plan participants to the existence of the anti-assignment provision. 601 F.3d at 522. It also noted that plaintiffs had failed to proffer any evidence that plan participants were deprived of access to the plan documents. *Id.* A close reading of the case, therefore, suggests that the *Riverview* court did not hold that an assignee can plead and prove estoppel only if it can allege and show that the plan denied plan participants access to the plan documents; it merely held that plaintiffs had failed to show that defendant had failed either to furnish or making available to its insureds the documents. As that was the only basis on which plaintiffs asserted an estoppel had arisen, that was the only basis addressed by the court. Stated differently, the *Riverview* court had no cause to address whether, under the circumstances presented in *Hermann* and *Productive MD* – circumstances similar to those CareFirst pleads here – a failure to provide the documents

34

Care First has not alleged that the plan agreements were not furnished or made available to it, either by defendants or by CC and DC. For that reason, it has not adequately alleged that defendants are estopped from relying on the anti-assignment provisions in the plan agreements and its ERISA claims must be dismissed.

### b. Whether Defendants Have Waived their Right to Raise the Anti-Assignment Provisions

Care First has also inadequately alleged that defendants waived their right to rely on the anti-assignment provisions. Care First contends there has been a waiver because defendants did not identify the anti-assignment provisions during the administrative process as a basis for denying the claims.[58] "Waiver is often described as the intentional relinquishment of a known right." *Gordon v. Deloitte & Touche, LLP Group Long Term Disability Plan*, 749 F.3d 746, 752 (9th Cir. 2014). The Ninth Circuit has recognized that an insurer is required to provide a reason for denying a claim when communicating the denial, and that it will be deemed to have waived the right to rely on any reason not cited in the denial letter. See, e.g., *Harlick v. Blue Shield of California*, 686 F.3d 699, 719 (9th Cir. 2012) ("A plan administrator may not fail to give a reason for a benefits denial during the administrative process and then raise that reason for the first time when the denial is challenged in federal court, unless the plan beneficiary has waived any objection to the reason being advanced for the first time during the judicial proceeding"); *Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192, 1199 n. 2 (9th Cir. 2010) (stating in dicta that "we are not persuaded that the district court erred in concluding that MetLife waived

containing the anti-assignment provision to an assignee gave rise to an estoppel. Whether the plan could be estopped from raising an anti-assignment provision because it had denied the assignee access to the plan documents was not before the court. As defendants do not identify any other basis on which the court should conclude that a plan can be estopped from raising an anti-assignment provision only if the assignee can allege the plan denied both it and the participants/beneficiaries access to the plan documents, the court declines, at this point, to apply such a rule. Defendants may raise this issue again at an appropriate time and cite additional authority and the court will reconsider the question in light of the record that then exists.

[58] Opposition at 10-18.

EXHIBIT A
PAGE 39

its date of onset coverage defense. The purpose of ERISA's requirement that plan administrators provide claimants with the specific reasons for denial is undermined 'where plan administrators have available sufficient information to assert a basis for denial of benefits, but choose to hold that basis in reserve rather than communicate it to the beneficiary.' 'Waiver provides insurers with an incentive to investigate claims diligently. The doctrine prevents insurers from denying claims for one reason, then coming forward with several other reasons after the insured defeats the first,'" quoting *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 129 (1st Cir. 2004)). "Waiver provides insurers with an incentive to investigate claims diligently. The doctrine prevents insurers from denying claims for one reason, then coming forward with several other reasons after the insured defeats the first." *Aceves v. Allstate Insurance Co.*, 68 F.3d 1160, 1163-64 (9th Cir. 1995).

Although the Ninth Circuit has applied waiver in rejecting a plan's substantive arguments concerning denial of an ERISA benefits claim, it has not yet addressed whether a plan can waive its right to rely on an anti-assignment provision. Other courts have, however, and have held that waiver applies in this context as well.[59] They have noted that the waiver "must be voluntary and [that] there must be a clear act showing the intent to waive the right" to rely o the anti-assignment provision. *North Jersey Brain and Spine Center*, 2013 WL 5366400 at *6. "A party may waive an anti-assignment provision 'by a written instrument, a course of dealing, or even passive conduct, i.e., taking no action to invalidate the assignment vis-a-vis the assignee.'" *Gregory Surgical*, 2007 WL 4570323 at *3; see also *Lutheran Medical Center of Omaha, Nebraska v. Contractors, Laborers, Teamsters and Engineers Health and Welfare Plan*, 25 F.3d 616, 619-20 (8th Cir. 1994) (holding that a plan had waived its right to rely on an anti-assignment clause because it had paid benefits to assignees for several years and stated in its summary plan description that a participant could assign rights, such that its "actual practice [was] not in conformity with its strict anti-assignment provision"), abrogated on other grounds by *Martin v.*

---

[59] See RJN, Exh. A (*Toll Global* Order at 4 ("[B]y allegedly failing to assert the anti-assignment provision during the administrative process as a reason for denying benefits to Plaintiff, the Plan forfeited the ability to assert that defense in the instant lawsuit")).

EXHIBIT A
PAGE 40

1    *Arkansas Blue Cross and Blue Shield*, 299 F.3d 966 (8th Cir. 2002);[60] *Ambulatory Surgical*

2    *Center*, 2008 WL 8874292 at *3 ("ASNCJ has standing under ERISA due to Horizon's waiver

3    of its anti-assignment provision based on its course of dealings with ASCNJ. . . . [A] party may

4    waive an anti-assignment provision 'by a written instrument, a course of dealing, or even passive

5    conduct, i.e., taking no action to invalidate the assignment vis-a-vis the assignee'" (internal

6    citation omitted)).

7          Defendants argue first that waiver does not apply because a lack of standing to sue cannot

8    be waived.[61]  Although defendants do not articulate the basis for their argument, it appears they

9    assert that standing is a jurisdictional requirement that cannot be waived.  The court finds this

10   argument unpersuasive.  Whether a party has Article III standing because it has suffered

11   constitutional injury is, of course, quite different than whether a party has standing under the

12   terms of an anti-assignment clause in a contract.  The first is an element of subject matter

13   jurisdiction, and a party can never be prevented, in equity, from raising the issue.  The second

14   _____

15         [60]Defendants argue that *Lutheran* is inapposite because no court in the Ninth Circuit has

16   followed it and because the plan terms here are unambiguous.  (Reply at 14.)  The fact that no
     court in the Ninth Circuit has relied on *Lutheran*, of course, is not a reason the court should not

17   find it persuasive.  Defendants cite no authority in the Ninth Circuit suggesting that *Lutheran* is
     *not* persuasive.  At the hearing, moreover, defendants expounded on their argument that *Lutheran*

18   is distinguishable because the anti-assignment provision here is unambiguous, contending that the
     *Lutheran* court found an ambiguity in the plan there at issue because it was inconsistent with the

19   summary plan description.  Defendants misconstrue *Lutheran*.  The *Lutheran* court explicitly

20   stated that the scope of the anti-assignment provision at issue was "clear[ ][.]"  25 F.3d at 619.
     It concluded that the provision did not preclude enforcement of the assignments for two reasons:

21   first, because it did "not prohibit assignment of causes of action arising after the denial of
     benefits," such as the one at issue in that case, and second, because the fact that the plan had paid

22   benefits to assignees for years and affirmatively represented in its summary plan description that

23   participants could assign their benefits "if [they] wish," precluded it from relying on the strict anti-
     assignment provision.  *Id.*  The court did not state that the fact that the summary plan description

24   was inconsistent with the terms of the plan rendered the anti-assignment provision ambiguous and
     unenforceable on that basis.  Rather, it held that the plan had waived its right to raise the anti-

25   assignment provision because of its course of dealing and affirmative representations about the

26   provision to plan participants.  Consequently, the court is not persuaded that *Lutheran* is not

27   relevant.

28         [61]Reply at 5.

                                           37

is a question of prudential, third-party standing; a defendant can be prevented, in equity, from raising such an issue under appropriate circumstances. See *Bilyeu v. Morgan Stanley Long Term Disability Plan*, 683 F.3d 1083, 1090 (9th Cir. 2012) (noting, in an ERISA case, that "[u]nlike constitutional standing, which is jurisdictional, we presume that statutory standing may be waived. By failing to raise this argument, Bilyeu thus waived her challenge to Unum's standing as a fiduciary under ERISA"); see also *Association of Public Agency Customers v. Bonneville Power Administration*, 733 F.3d 939, 954 n. 27 (9th Cir. 2013) ("Unlike Article III standing, the issue of a party's prudential standing can be waived if not raised in a timely manner"); *Association of Christian Schools International v. Stearns*, 678 F.Supp.2d 980, 984 (C.D. Cal. 2008) ("Generally, standing cannot be waived if based on constitutional requirements imposed by Article III. . . . However, federal courts also impose judicially created 'prudential' standing requirements that further limit their jurisdiction"); *North Jersey Brain and Spine Center*, 2013 WL 5366400 at *7 (holding that a plan "waived its right to enforce the anti[-]assignment clause" and denying "[d]efendant's motion to dismiss the Complaint for lack of standing").

In support of their argument, defendants cite *City of Los Angeles v. County of Kern*, 581 F.3d 841, 845 (9th Cir. 2009). That case explicitly noted the difference between constitutional and prudential standing and held that constitutional standing "cannot be waived by any party," while "'prudential' standing, 'can be deemed waived if not raised[.]'" *Id.* (citations omitted). *Spinedex*, also cited by defendants, is unpersuasive because it did not distinguish between constitutional and prudential standing in determining that a plan could not waive a challenge to derivative standing based on an anti-assignment clause. See *Spinedex*, 2012 WL 8169880, at *5. Accordingly, the court cannot accept defendants' argument that a plan can never waive its right to assert an anti-assignment provision to defeat a plaintiff's claim that it has prudential standing as an assignee of a plan participant or beneficiary.

Defendants next contend that they have not waived their right to raise the anti-assignment provisions because those provisions concern a party's standing to sue and are not a substantive

EXHIBIT A
PAGE 42

basis for denial of a claim.[62]  Defendants cite *Gordon*, 749 F.3d at 746, as support for this argument.[63]  In *Gordon*, the court rejected plaintiff's argument that an insurer had waived its right to assert a statute of limitations defense because the "statute of limitations was never the basis for MetLife's denial of Gordon's claim.  The basis was the Plan's provision that limits benefits for disabilities stemming from mental health conditions, and that basis was clearly communicated to Gordon."  *Id*.  The court disagrees that *Gordon* supports defendants' position at this stage of the proceedings.  The *Gordon* court affirmed the district court's entry of summary judgment in favor of the plan.  The summary judgment record showed that plaintiff's claim had been denied because it did not satisfy a substantive limitation on coverage, not because it was untimely.  Rather, the statute of limitations defense arose after the claim was denied when plaintiff took no action to appeal for an extended period of time.  *Id*. at 749.  Here, the complaint contains no allegations as to whether Care First's claims related to treatment of CC and DC were denied because they fell outside plan coverage or whether they were denied because of the anti-assignment provisions of the plan agreements.

Perhaps recognizing this fact, defendants argue that the plan agreements allow the plan to make payments to providers only for the convenience of plan participants and that Care First's requests for reimbursement were administered according to the terms of the plan.[64]  In essence, defendants argue that they had no obligation to make payments to Care First and that Care First's assignee status could thus not have been the reason defendants denied its claims.  This argument is illogical as it necessarily relies on the fact that the plan agreements contained anti-assignment provisions and implies that the reason for the plan's denial of Care First's claims was that Care First was not entitled to payment under the plan agreements under those provisions.  As noted, the complaint contains no allegations concerning the reason for the denial, and the court therefore cannot determine the matter in deciding defendants' motion to dismiss.

---

[62]*Id*. at 5-6.

[63]*Id*. at 11.

[64]*Id*.

EXHIBIT A
PAGE 43

The court does agree with defendants, however, that Care First has not adequately alleged that they waived their right to rely on the anti-assignment provisions in the plan agreements. While Care First argues in its opposition that defendants never raised the anti-assignment provisions during the administrative process, as noted it does not allege this fact in the complaint. Facts discussed in a party's brief are not allegations in the complaint, and the court cannot consider them in determining the sufficiency of the pleadings. See *Garza*, 2012 WL 5267897, at *2 ("Plaintiffs present a number of potential theories by which CVS may have acted negligently in their opposition but arguments in an opposition are not factual allegations that this Court may consider"); *Stine*, 2008 WL 4068904, at *4 ("[T]he Court will not consider factual allegations made in a plaintiff's opposition"). The complaint pleads only that after Care First submitted claims, "the Plan issued adverse benefit determinations on [them]."[65] It does not allege that defendants denied the claim for a reason other than Care First's status as an assignee, or that they failed to provide a written explanation of the denial of benefits. It pleads no facts concerning the manner in which defendants failed to raise the anti-assignment provisions during the administrative process. For this reason, Care First has not adequately pled that defendants waived their right to rely on the anti-assignment provisions in the plan agreements. Care First's ERISA claims must therefore be dismissed.

### D. Whether Care First's Second Cause of Action Seeking Penalties for Violation of 29 C.F.R. § 2560.503-1 Must Be Dismissed

In addition to challenging Care First's standing to sue, defendants move to dismiss Care First's second cause of action under 29 U.S.C. § 1132(c), which seeks penalties for failure to make the disclosures required by 29 C.F.R. § 2560.503-1, on the basis that a plaintiff cannot recover penalties under § 1132(c) for violation of the regulatory provisions of § 2560.503-1.[66]

There are two sources of disclosure requirements under ERISA: 29 U.S.C. § 1024(b)(4) and 29 C.F.R. § 2560.503-1, which is an implementing regulation for 29 U.S.C. § 1133. Section

---

[65]Complaint, ¶ 16.

[66]Motion at 8-9.

40

1024(b)(4), which is the basis for Care First's first cause of action, imposes on ERISA plan administrators an obligation to furnish copies of certain documents related to the plan "upon written request of any participant or beneficiary." Specifically, the statute requires disclosure of "a copy of the latest updated summary [ ] plan description, and the latest annual report, any terminal report, [and] the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4).

Care First's second cause of action seeks disclosure and penalties for defendants' alleged failure to make the disclosures required by 29 C.F.R. § 2560.503-1(g), (h), and (m).[67] These provisions require that ERISA plan administrators provide "a claimant with written or electronic notification of any adverse benefit determination," *id.*, § 2560.503-1(g), and mandate that ERISA plans[68] establish "a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination," *id.*, § 2560.503-1(h)(1). Paragraph (h)(2)(iii) specifies that claims review procedures must

> "[p]rovide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information

---

[67]Subsection (m) merely sets forth definitions of terms used in other subsections of the regulation.

[68]The requirements of subsection (h) are imposed on plans as opposed to plan administrators. By its terms, paragraph (h) does not impose requirements on plan administrators. Rather, it sets forth requirements that a plan must meet in establishing claims review procedures. See *Anderson v. Sotheby's Inc. Severance Plan*, No. 04 Civ. 8180 SAS(DFE), 2005 WL 1309056, *4 (S.D.N.Y. May 31, 2005) (noting that paragraph (h) applies to plans, not plan administrators); see also *Groves v. Modified Retirement Plan for Hourly Paid Employees of Johns Manville Corp. and Subsidiaries*, 803 F.2d 109, 116 (3d Cir. 1986) ("[T]he terms 'plan' and 'plan administrator' refer to two terms entirely distinct actors. The words 'plan administrator' and 'employee benefit plan' are terms of art under ERISA. Both are given specific meanings by ERISA's definition section, 29 U.S.C. § 1002 (1985). See §§ 1002(1), 1002(2)(A), 1002(3) and 1002(16)(A). While 'plan' refers to a variety of 'plan[s], fund[s], or program[s],' 29 U.S.C. § 1002(1), 'plan administrator' is defined, with exceptions not relevant here, as 'the person specifically so designated by the terms of the instrument under which the plan is operated.' 29 U.S.C. § 1002(16)(A)(I)" (alteration original)).

41

1   relevant to the claimant's claim for benefits.  Whether a document, record, or other
2   information is relevant to a claim for benefits shall be determined by reference to
3   paragraph (m)(8) of this section."  *Id.*, § 2560.503-1(h)(2)(iii).

4   Paragraph (m)(8), in turn, states that a document is relevant if it was "relied upon," or
5   "submitted, considered, or generated" in the course of the benefit determination. *Id.*, § 2560.503-
6   1(m)(8)(ii). Also relevant are documents that "constitute[ ] a statement of policy or guidance with
7   respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis,
8   without regard to whether such advice or statement was relied upon in making the benefit
9   determination." , § 2560.503-1(m)(8)(iv).

10   As noted, section 2560.503-1 is the regulation implementing 29 U.S.C. § 1133, which
11   provides:

12   "In accordance with regulations of the Secretary, every employee benefit plan shall
13   –

14   (1) provide adequate notice in writing to any participant or beneficiary whose claim
15   for benefits under the plan has been denied, setting forth the specific reasons for
16   such denial, written in a manner calculated to be understood by the participant, and
17   (2) afford a reasonable opportunity to any participant whose claim for benefits has
18   been denied for a full and fair review by the appropriate named fiduciary of the
19   decision denying the claim."  29 U.S.C. § 1133.

20   29 U.S.C. § 1132(c)(1)(B) renders an administrator liable for civil penalties for failure to
21   comply with its disclosure requirements.  The section states that

22   "[a]ny administrator . . . who fails or refuses to comply with a request for any
23   information which such administrator is required by this subchapter to furnish to
24   a participant or beneficiary (unless such failure or refusal results from matters
25   reasonably beyond the control of the administrator) by mailing the material
26   requested to the last known address of the requesting participant or beneficiary
27   within 30 days after such request may in the court's discretion be personally liable
28   to such participant or beneficiary in the amount of up to $100 a day from the date

42

1    of such failure or refusal, and the court may in its discretion order such other relief

2    as it deems proper."[69]

3    As noted, defendants argue that a plaintiff cannot recover penalties under § 1132(c) for a

4    plan's or a plan administrator's failure to comply with disclosure obligations under § 2560.503-1.

5    As support for this argument, they cite *Prado v. Allied Domecq Spirits and Wine Group Disability*

6    *Income Policy*, 800 F.Supp.2 1077 (N.D. Cal. 2011). In *Prado*, the court held that "[b]y its

7    terms, section 1132(c) is limited to information required by 'this subchapter.' 29 U.S.C. §

8    1132(c). As such, it does not extend to documents identified in 29 C.F.R. § 2560.503-1." 800

9    F.Supp.2d at 1101. Care First disputes this, citing *Sgro v. Danone Waters of North America,*

10   *Inc.*, 532 F.3d 940 (9th Cir. 2008). It argues that *Sgro* holds that plans and plan administrators

11   can be liable for civil penalties under § 1132(c) if they fail to disclose documents required either

12   by ERISA or by its implementing regulations.[70] In *Sgro*, a plan denied a participant's claim for

13   benefits. *Id.* at 942. The participant requested that the plan give him copies of all documents

14   pertaining to the claim. *Id.* He later sued seeking penalties because the plan had allegedly failed

15   fully to comply with his document request under § 2560.503-1. The district court dismissed his

16   claim, *id.*, and the Ninth Circuit affirmed, noting that Sgro's complaint did not allege the identity

17   of the defendant to which he had submitted the records request. *Id.* at 945. In so holding, the

18   court noted that

19   "Sgro argues that MetLife's failure to provide these documents violated ERISA

20   regulations, which require that 'a claimant shall be provided, upon request and free

21   of charge, reasonable access to, and copies of, all documents, records, and other

22   information relevant to the claimant's claim for benefits.' 29 C.F.R.

23   § 2560.503-1(h)(2)(iii). The documents that MetLife is alleged to have held back

24   are 'relevant,'and thus covered by this regulation, because they were 'generated in

25

26   [69]By regulation, the maximum penalty under § 1132(c)(1) is now $110 per day. 29 C.F.R.

27   § 2575.502c-3.

28   [70]Opposition at 17.

43

1   the course of making the benefit determination.' *Id.* § 2560.503-1(m)(8)(ii).

2   ERISA's remedies provision gives Sgro a cause of action to sue a plan

3   'administrator' who doesn't comply with a 'request for . . . information.' 29

4   U.S.C. § 1132(c)(1)." *Id.* at 945.

5   The court remanded the case with directions that the district court allow Sgro to "amend his

6   complaint to allege that he requested the[ ] documents from Danone Waters, if he can do so in

7   good faith." *Id.*

8       Despite what appears to be an implicit affirmation by the *Sgro* court that plaintiffs can sue

9   for penalties under § 1132(c) when a plan or plan administrator fails to produce documents

10  required by § 2560.503-1, every district court decision in this circuit of which the court is aware

11  has, like the *Prado* court, held that *Sgro's* discussion of a plaintiff's ability to recover penalties

12  for failure to disclose documents required by the regulations is dicta. These courts have followed

13  the First, Third, Sixth, Seventh, and Eighth Circuits, all of which have concluded that the plain

14  language of § 1132(c) provides penalties only for violations of "this subchapter," which does not

15  include § 1133, and that § 1133, which imposes obligations only on benefit plans, cannot support

16  the imposition of liability on a plan administrator under § 1132(c). These circuits and the district

17  courts in this circuit that have followed their reasoning have each concluded that a plaintiff can

18  thus not recover penalties under § 1132(c) for a violation of § 1133 or its implementing

19  regulations. See *Streit v. Matrix Absence Management, Inc.*, No. 3:12–CV–01797–AC, 2014 WL

20  667535, *4 n. 2, *6 (D. Or. Feb. 18, 2014) (noting that the court was "not bound by any

21  implication of the Ninth Circuit's decision to remand in *Sgro*" because "in *Sgro* the Ninth Circuit

22  'never reached the issue whether a penalty claim is appropriate based on" § 2560.503-1, and

23  holding that plaintiff could not recover penalties under § 1132(c) for violations of § 2560.503-1

24  because "[n]o part of ERISA grants the Secretary of Labor the power to decide that plan

25  administrators' conduct is to be penalized' under § 1132" (internal citations omitted and alteration

26  original)); *Metcalf v. Blue Cross Blue Shield of Michigan*, No. 3:11–cv–1305–ST, 2013 WL

27  4012726, *23 (D. Or. Aug. 5, 2013) ("[T]he Ninth Circuit simply did not address this particular

28  argument head on [in *Sgro*]. . . .  [T]he question remains as to what the Ninth Circuit would

EXHIBIT A
PAGE 48

conclude if confronted with the decisions in five other circuits, including the First, Third, Sixth, Seventh, and Eighth Circuits, that have held to the contrary"); *Moyle*, 2013 WL 3316898, at *17-18 ("The Court finds the reasoning and analysis in *Bielenberg* persuasive.  Plaintiffs may not seek 29 U.S.C. § 1132 penalties for violations of 29 C.F.R. § 2560.503-1(H)(2)(iii)); *Konty v. Liberty Life Assurance Co. of Boston*, Civil No. 3:12–CV–00467–KI, 2012 WL 5363545, *4 (D. Or. Oct. 30, 2012) ("*Sgro* is not dispositive on this issue because the court never reached it[.] . . .  A violation of 29 C.F.R. § 2560.503-1(j) cannot trigger a penalty under Section 1132 because the documents called for in the regulation do not fall within the list of documents covered by Section 1132"); *Bielenberg v. ODS Health Plan, Inc.*, 744 F.Supp.2d 1130, 1143 (D. Or. 2010) ("Bielenberg cites *Sgro* as Ninth Circuit authority for the proposition that a violation of 29 CFR § 2560.503–1(h)(2)(iii) is a proper vehicle for assessing penalties under 29 USC § 1132(c)(1).  However, *Sgro* concluded that the claimant named an improper party and, therefore, never reached the issue whether a penalty claim is appropriate based on the regulation cited by Bielenberg.  This court is persuaded by the reasoning of the other circuits which have actually addressed the issue and declines to impose liability under 29 USC § 1132(c) for a violation of the regulations to 29 USC § 1133"); *see also Medina v. Metropolitan Life Insurance Co.*, 588 F.3d 41, 48 (1st Cir. 2009) ("It is well established that a violation of § 1133 and its implementing regulations does not trigger monetary sanctions under § 1132(c)"); *Brown v. J.B. Hunt Transportation Services., Inc.*, 586 F.3d 1079, 1089 (8th Cir. 2009) ("[W]e agree with our sister circuits that a plan administrator may not be penalized under § 1132(c) for a violation of the regulations to § 1133"); *Wilczynski v. Lumbermens Mutual Casualty Co.*, 93 F.3d 397, 405–07 (7th Cir. 1996) ("[T]he obligations of section 1133 are imposed only on benefit 'plans.'  Because section 1132(c) authorizes the imposition of sanctions only for the failures or refusals of the 'plan administrator,' and not those of the 'plan,' we hold that section 1132(c) cannot be used to impose civil liability for the violation of section 1133 alleged by [the plaintiff]. . . .  [Moreover], because section 1132(c) authorizes penalties only for an administrator's refusal to comply with a request for information required to be furnished by 'this subchapter,' 29 U.S.C. § 1132(c), the sanctions imposed by that section may not be imposed for the violation of an agency regulation"); *Stuhlreyer*

*v. Armco, Inc.*, 12 F.3d 75, 79 (6th Cir. 1993) ("[A] plan administrator cannot violate § 1133 and thus potentially incur liability under § 1132(c), because § 1133 imposes obligations on the 'plan' rather than the 'plan administrator'"); *Groves v. Modified Retirement Plan for Hourly Paid Employees of Johns Manville Corp. & Subsidiaries*, 803 F.2d 109, 116–18 (3d Cir. 1986) ("Because § 502(c) authorizes penalties only for breach of duties impose by 'this subchapter,' such sanctions cannot be imposed for violation of an agency regulation. We therefore reject Groves's request for sanctions for the Plan administrator's failure to comply with 29 C.F.R. § 2560.503-1(f)").

The court agrees with the reasoning of these courts. It concludes that *Sgro* is not binding precedent on the issue, and that the rationale of the First, Third, Sixth, Seventh, and Eighth Circuits and the district courts cited is persuasive. The plain language of § 1132(c) authorizes the imposition of penalties for a plan's failure to make the document disclosures required by § 1124; it does not authorize the imposition of penalties on a plan or a plan administrator for failure to make the document disclosure mandated by § 1133 and its implementing regulations. Care First has cited no authority other than *Sgro* as support for its position to the contrary.[71] The court therefore joins the circuit and district courts cited in concluding that a plaintiff cannot recover under § 1132(c) for violations of § 1133's implementing regulations. Indeed, as the *Wilczynski* court noted, "[a] decade has passed since the Third Circuit's holding in *Groves* [that a plaintiff cannot recover penalties under § 1132(c) for non-disclosure under § 2560.503-1]. The Sixth Circuit, addressing one aspect of the *Groves* holding, has found it to be an accurate interpretation of the legislative intent. *See Stuhlreyer*, 12 F.3d at 79. Congress has not changed the statute; nor has the Department of Labor changed the pertinent regulation." 93 F.3d at 407. For these

---

[71] *See id.* at 17-18. Care First does cite *Crotty v. Cook*, 121 F.3d 541, 546 (9th Cir. 1997). That case, however, involved penalties for violation of § 1024; it did not involve a claim that defendant had violated § 2560.503-1. *Crotty* therefore does not support Care First's position.

1    reasons, so much of Care First's second cause of action as seeks penalties under § 1132(c) for

2    failure to make the document disclosures required by § 1560.503-1 must be dismissed.[72]

3        **E.**    **Whether the Court Should Exercise Supplemental Jurisdiction over Care**

4            **First's State Law Claims**

5            Care First's ERISA claims provide the sole basis for federal subject matter jurisdiction in

6    this case.  Because the court dismisses these claims, it declines to exercise jurisdiction over its

7    state law claims at this time.  See *Wade v. Regional Credit Association*, 87 F.3d 1098, 1101 (9th

8    Cir. 1996) ("Where a district court dismisses a federal claim, leaving only state claims for

9    resolution, it should decline jurisdiction over the state claims and dismiss them without

10

---

11        [72]The court dismisses only so much of the second cause of action as seeks penalties for

12    failure to disclose documents under § 1132(c) because penalties under that section cannot be

13    recovered for a violation of § 1560.503-1.  The court does not pass on the viability of Care First's

claim to the extent it seeks disclosure of documents under § 1560.503-1, which explicitly requires

14    plans to provide claimants with certain documents.  See 29 C.F.R. § 1560.503-1(h)(2)(iii).  At

the hearing, defendants argued that the second cause of action had to be dismissed in its entirety

15    under *Prado*.  The court notes, first, that defendants did not make this argument in their motion

to dismiss.  (See Motion at 8-9 (arguing only that the second cause of action must be dismissed

16    because a plaintiff cannot recover statutory penalties under § 1132(c) for failure to disclose

documents under § 1560.503-1)).  Even if the court were to entertain the untimely argument,

17    however, it would conclude that it lacks merit.  The *Prado* court held only that a plaintiff cannot

recover statutory penalties under § 1132(c) for failure to disclose documents required by

18    § 1560.503-1.  It did not hold that a plaintiff could not obtain an injunction requiring a plan to

disclose documents it has a duty to disclose under § 1560.503-1.  See *Prado,* 800 F.Supp.2d at

19    1101 ("By its terms, section 1132(c) is limited to information required by 'this subchapter.'  29

20    U.S.C. § 1132(c).  As such, it does not extend to documents identified in 29 C.F.R. § 2560.503-

21    1").

    At the hearing, defendants also argued that "the court might want to consider . . . how . . .

22    [Care First's] first cause of action [can] go forward if the second cause of action does not."

23    Again, defendants did not make this argument anywhere in their briefing of the motion to dismiss.

Even considering the merits of the argument, the court finds it unpersuasive.  As noted, the reason

24    Care First's claim for penalties under § 2560.503-1 fails is because a plaintiff cannot recover

penalties under the statute for a violation of the regulation.  Care First's first claim seeks penalties

25    under § 1132(c) for failure to disclose documents that that section specifically requires be

26    disclosed.  The fact that plaintiff cannot recover penalties under § 1132(c) for a violation of

27    § 2560.503-1 is not inconsistent with the notion that plaintiff can recover penalties under § 1132(c)

for a violation of § 1132(c) itself.  The court does not, however, pass on the merits of Care First's

28    § 1132(c) claim beyond noting that it finds defendants' argument at the hearing unavailing.

EXHIBIT A

PAGE 51

prejudice"); *Harrell v. 20th Century Insurance Co.*, 934 F.2d 203, 205 (9th Cir. 1991) ("[I]t is generally preferable for a district court to remand remaining pendent claims to state court"); *Anderson v. Countrywide Financial*, No. 2:08-cv-01220-GEB-GGH, 2009 WL 3368444, *6 (E.D. Cal. Oct. 16, 2009) ("Since state courts have the primary responsibility to develop and apply state law, and the *Gibbs* values do not favor continued exercise of supplemental jurisdiction over Plaintiff's state claims, Plaintiff's state claims are dismissed under 28 U.S.C. § 1367(c)(3)"); 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a [state-law] claim [if] . . . the district court has dismissed all claims over which it has original jurisdiction"). See also *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law").

### III.  CONCLUSION

For the reasons stated, the court grants defendants' motion to dismiss.  That aspect of Care First's second claim seeking penalties for failure to make the disclosures required by 29 C.F.R. § 2560.503-1 is dismissed with prejudice.  Care First's first, third, and fourth ERISA claims, as well as its state law claims, are dismissed without prejudice.  Care First may file an amended complaint within twenty (20) days of the date of entry of this order should it be able to cure the deficiencies noted herein.

DATED:  July 28, 2014

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

48